JAMES REVEL, plaintiff in error, vs. THE STATE OF GEORGIA. defendant in error.

[1.] When the Superior Court is opened and organized, at the regular time appointed by law for holding the same, it is competent for the Judge to adjourn over to a futr∙e day or week, that he may see fit.

Revel vs. The State.

[2.] 1st. A continuance will not be granted in a criminal case, on account of the excited state of the public mind, after five months have elapsed since the crime was committed. 2d. Continuances are still within the sound discretion of the Court, and do not fall under the New Trial Act of 1853. 3d.· Where the accused has ample time after his arrest, to make preparation for his trial, the *recent* finding of the bill of indictment by the grand jury, is no excuse for postponing the cause; especially, where the offence for which the prisoner is to be prosecuted is well known to him—the only question being as to the grade of the homicide which he has committed. 4th. The fact that the defendant is imprisoned, is no reason why he should not make preparation for his defence. 5th. If it appear to the *Court that the* testimony of an absent witness is immaterial, a continuance will not be granted.

[3.] When former panels of the jury are rejected, by reason of challenges to the polls, the Court will summon new panels, until an impartial jury can be obtained to try the cause.

The Act of 1856, regulating the mode of selecting juries in criminal cases, does not repeal all other laws upon the same subject, but such only as are in conflict with it.

[4.] Where the prisoner, after killing the deceased, effects his escape, and to enable him to do so, takes the life of another person, and attempts to shoot others, these acts of violence may be given in evidence on the trial for murder, as well to manifest the deep self-consciousness of the accused of his guilt, as to characterize the *quo animo* with which the deed was perpetrated.

[5.] To constitute murder, it is not necessary that the prisoner should entertain personal ill-will toward the deceased.

[6.] A verdict is not objectionable for irregularity, for finding the defendant guilty of murder, instead of guilty generally.

[7.] The jury being made the judges both of the law and the facts in criminal cases, their verdict will not be disturbed unless it be clear that the defendant has been wrongfully convicted.

[8.] If the jail of the county, where a conviction is had in a criminal case, is insecure, it is competent for the Court to order the prisoner to be committed to the jail of another county for safe keeping.

NOTE.—Would it not be well to direct all capital felons to be kept in the Penitentiary, especially after conviction? And also, to be executed there in the presence of the convicts. Quere?

Murder, in Crawford Superior Court. Tried before Judge LAMAR, at March Term, 1858.

The facts of this case are stated in the opinion of the Court.

HUNTER; and LOCHRANE, for plaintiff in error.

SOL. GEN.; and S. HALL, for the State.

Revel vs. The State.

*By the Court.*—LUMPKIN J. delivering the opinion.

[1.] Was the Court right in overruling the plea to the jurisdiction of the Court in this case?

The regular Terms of Crawford Superior Court are on the first Mondays in March and September. To accommodate the bar, who were in attendance on the Supreme Court at Macon, Judge Lamar determined to adjourn over Crawford Court. He first acted under the statute of 1823, *(Cobb,* 460,*)* as amended in 1837, *(Cobb,* 461,*)* that is, through the agency of the Clerk. But reflecting that he could not order an adjournment through this officer, except on account of the sickness of himself or his family, or some other Providential cause, which cause the law required to be expressed in the order of adjournment, he attended in person, at the regular Term for holding the Court; opened the Court; offered to hear motions, &c., and then adjourned over the Court till the Monday following. I confess I am unable to comprehend the objection to the regularity of this proceeding.

If the Court that tried the prisoner during the second week was not legally constituted, then no adjourned Court ever held in this State was. The Courts have the power, and they have uniformly and universally exercised it for three score years, when once organized, of adjourning from day to day, or from week to week, even passing over intervening sessions in other counties, until they have completed the business of the Term; and we know of no limitation or restriction upon this right. The Acts cited have no application to a Court which has been properly organized, and which has entered upon the duties of the Term.

[2.] Ought the continuance to have been allowed?

The showing is made up of several distinct grounds. As to the public excitement, there is nothing in that. The offence had been committed five months before the prisoner was put upon his trial. Surely, this was sufficient time for the mind of the comunity to become tranquilized, if it ever was

unduly excited.   It  is manifest, that such inde' d was the
fact.   Seven impartial jurors were selected and sworn out of
the first panel of forty-eight; and the remaining  five out of
the next.   And it does not appear that  the whole  of this se-
cond panel was exhausted.   No public passion, which would
prevent a fair trial, coul'l have prevailed under such circum-
stances.   The prisoner was mistaken if he thought so.

And then, as to his want of opportunity to prepare for his
defence, by reason of the recent finding of the bill; that does
not meet the truth  of the case.   The accused had been ar-
rested for this offence, and committed to  jail five months be-
fore.   What prevented him from setting about at once to hunt
up his testimony, if he  had  any ?   He might have  applied
for  compulsory process to coerce the attendance of witness-
es.   If this had  been  denied,  his application would have
seemed more reasonable.   The transaction was not compli-
cated, involving any mystery  to  be  unraveled; there were
but few persons present when the homicide  was committed.
They were doubtless all  known  to the defendant.   Most, if
not all of them, have been  examined on the trial.   True, the
accused could not anticipate with certainty, whether the grand
jury would find a true bill for murder or manslaughter.   He
could but foresee, however, that the same proof would be re-
quired in either event.   Indeed, it would  readily  occur to
him, that his main purpose  would be to  mitigate the crime
from murder to manslaughter.

If the fact of his imprisonment hindered him  from  doing
any thing for five months, how much better off would he be
were the time prolonged.   He would not have been bailed after
the true bill for murder was found.   One witness, Elizabeth
Bundrick,  was subpœnaed and did not attend.   Was her testi-
mony material, or  even  relevant ?   Whether Adams was
killed by Revel, or died under the want of skill  in the sur-
geon, in attempting to extract the ball from the wound,  is a
matter of little or no consequence in the present issue.   Re-
vel admits, in his affidavit for  a  continuance, that he shot

Revel vs. The State.

both Adams and Hammock. True, he says it was in self-defence. He does not dispute intending to kill Adams. If he was not justifiable, then, he was guilty of an assault with intent to kill Adams. It follows, therefore, that the degree of criminality between the two cases, as to Adams, was too slight to make any perceptible difference on the trial for killing Hammock. And that, consequently, the evidence of Mrs. Bundrick was quite immaterial. It could not have affected the verdict of the jury.

[3.] The next objection is, as to the mode of selecting the jury.

The first panel of forty-eight was made up by adding to the twenty-four jurors in attendance upon the Court, a like number of talesmen, to which no exception was taken. Seven jurors having been selected and sworn out of this panel, forty-eight more were summoned and presented to the prisoner who, through his counsel, objected to this second panel, on the ground that it was not authorized by the Act of 1856, regulating the manner of empanneling a jury in a criminal case.

It is true, that the 2d, 3d, 4th, 5th, 6th and 7th sections of that Act refer only to new panels of forty-eight, where the former have been set aside by challenges to the array; and no part of the Act makes provision, in so many words, for summoning additional panels, where the former have been exhausted by challenges to the *polls.* Still, it may be inferred from several expressions in the Act, that the Legislature did not intend to change the old law in this respect. In section 10 it is said, that the Court shall proceed to apply the tests furnished by the Act to secure an impartial jury, "until a jury be empanneled to try the accused." Now, this requirement is impracticable, unless new panels are summoned. Again, in the 11th section, "until a jury is empanneled to try said case". *Pamphlet Acts,* 229, 230.

But suppose the Act was defective in this particular, it does not, like the attachment and garnishment law of that

Revel vs. The State.

session, repeal most unw 'sely all other laws in the State up-
on the same subject; but such only as are in conflict with it.
Of course, then, the old law would supply the remedy.

[4.] The Solicitor General proposed proving, that cotem-
poraneously with the killing of Hammock, prisoner shot one
Adams, who died of the wound; and snapped his pistol at
two other persons. to-wit: Smithson and Clay. Counsel for
the accused objected to this testimony on the ground of ir-
relevancy. It was admitted that prosecutions were pending
against Revel for each of these other offences. The merits
of this case are materially involved in this exception.

Without adverting to all the facts contained in this record,
it is sufficient to say, that these four men, Hammock and
Adams, Smithson and Clay, were all at Revel's grocery on
that occasion. The parties had been engaged in shooting
for beef. There was some political animosity between them.
And most, if not all of them, were excited by liquor. Ham-
mock had, a short while before the killing, insulted Revel.
But being put right as to the mistake under which he labor-
ed, he made prompt and ample apology, which Revel ac-
cepted as satisfactory. They conversed together in private.
While Hammock was outside of the door, Revel, who was
evidently in hot blood, peremptorily ordered Clay out of the
house, threatening to shoot him. And from the testimony
of Clay, this conduct was without provocation. Revel re-
marked that he had been insulted by a damned democrat,
meaning Hammock, and that he intended to have revenge.
Clay undertook to pacify him, and expressed the hope that
there would be no difficulty. And for this, he was rudely
thrust out of the house, with a hostile demonstration on the
part of Revel. Clay left the house; and my interpretation
of the evidence is, that Revel, with his revolver in his hand,
seemed to be following. Clay met Hammock just outside
the door, and for the purpose of defending himself against
Revel, snatched Hammock's gun out of his hand, which was
unloaded and without a cap. Hammock stepped into the

room, and meeting Revel, raised his hands; but whether he put them upon Revel, the proof is not clear. He seemed to be intending to prevent rather than inflict an injury. His attitude is inconsistent with the idea of offering personal violence to Revel. The witnesses inclined to the belief that his hands were not upon Revel. Hammock, in this position, is shot down. Smithson, the constable of the district, orders the persons present not to permit Revel to escape; and he and they attempt to prevent it. He shoots down Adams, an unoffending person, and snaps at Smithson and Clay, and effects his escape. Are not the whole of these acts a part of the *res gestæ?* Ought they to be suppressed? Can they be separated? Flight has always been considered an admission of guilt. When culprits thus recklessly destroy human life, in order to get away, is not the confession of conscious guilt thereby greatly strengthened? We think so; and that in this aspect of it, at least, the testimony was admissible. Still more so, perhaps, as an exponent of the *quo animo* of the accused.

[5.] It is argued that the malice which constitutes murder, must be felt toward the individual killed. Is this true? Where a gun is fired at random into a crowd, and life is taken, malice, says the law, shall be implied; and so too shall it be, declares the code, where no considerable provocation is given, and where all the circumstances of the killing denote an abandoned and malignant heart. True, there had been provocation by opprobrious words, but atonement had been made and accepted. The threat proven by Clay, indicates too clearly, that it had not been forgotten or forgiven. And his subsequent conduct shows that the prisoner was determined to wash out the insult with the blood of the deceased. His whole demeanor on that occasion was domineering and dictatorial. He stood in no fear of personal injury. These cotemporaneous acts were, we repeat, rightly let in, to characterize the motives of the prisoner.

Counsel, claiming to be surprised by letting in this testimo-

ny renewed his application for a continuance, in order to pro-cure the attendance of Mrs. Bundrick. We have already attempted to explain, that her testimony could have no ap-preciable effect upon the result of this case. It should have none; and the granting or refusing a continuance is still left to the discretion of the Court, and is not embraced in the new trial Act of 1853—an Act which we hope soon to see blotted from the statute book.

No complaint is made against the charge of the Court. The Judge gave the law as requested by defendant's counsel, and in the language of the request, with an addition about which there is no complaint.

The jury having returned a verdict of guilty, a motion for a new trial was made, on the grounds already reviewed, and others which we will briefly notice.

[6.] Exception was taken to the form of the verdict, name-ly: that it found the defendant guilty of murder instead of guilty only. This ground is very properly abandoned.

[7.] Because the verdict was contrary to law, contrary to evidence, and the charge of the Court.

The jury are made the judges of the law as well as of the facts, in criminal cases. Neither this nor any other Court should suffer a person to be deprived of his life, where his guilt is not fully established. Is this case so clear as to war-rant, much more to demand the interference of this Court? We think not. On the contrary, we must say, the testimony authorizes the verdict. No justification is shown for killing Hammock. And the attempt to destroy the lives of three oth-ers at the same time, to make his escape, evinces much dis-regard of human life. It would not be too strong to say, much depravity on the part of the prisoner.

[8.] As to the exception to the order, directing Revel to be removed from Crawford to Jones county, for safe keeping. Suppose we were to reverse it, as surely we shall not, that would not entitle the accused to a new trial. I see from the newspapers, that since the trial, the jail in Crawford county

has been burnt, and a man consumed in it. The prisoner cannot be sent back there. It may have been fortunate for him that he was not an inmate of that prison at the time.

Upon the whole, we feel constrained, after a careful examination of the law, as well as the evidence in this case, to affirm the judgment of the Court below.

Judgment affirmed.

NOTE.—Since this opinion was delivered, it is announced in the public press that Revel has escaped jail. Something must be done to secure the execution of the criminal laws. I have heretofore suggested the propriety of building circuit jails for the higher grade of criminals. Perhaps, a better plan would be to authorize them by law to be confined in the Penitentiary, at any rate, after conviction. In cases of capital felony, how would it do to have them executed there?