## FUNK *v.* THE UNITED STATES.

CRIMINAL LAW; MURDER; JURORS, QUALIFICATION OF; EVIDENCE;
    ARGUMENT TO JURY; INSTRUCTIONS to JURY; MISCONDUCT OF
    PROSECUTING ATTORNEY.

1. The necessary test of the qualification of jurors in a murder trial,
    under the act of Congress of January 15, 1898, giving the jury
    the right in such cases to qualify a verdict of guilty by
    adding the words "without capital punishment, is that they
    shall have no bias in favor of or prejudice against capital
    punishment or imprisonment for life; and questions addressed
    by the accused to talesmen in such a trial as to whether if the
    accused should be found guilty they would require mitigating
    circumstances before they would render a qualified verdict, or
    as to what circumstances they would require to so qualify
    their verdict, are properly excluded by the trial court.
2. Under Sec. 872, R. S. D. C., providing that "no person shall be
    competent to act as a juror unless he be  .  .  .  under sixty-
    five years of age," etc., a juror in a murder case does not
    become incapacitated to serve where he attains the age limit
    during the progress of the trial.   If competent when sworn,
    his competency continues throughout the trial.
3. In connection with evidence offered by the prosecution in a
    murder trial, of the flight, concealment and change of name
    of the accused, other attendant and incidental facts such as

a confession by the accused to an officer who had arrested him on another charge, of a contemplated assault for the purpose of escaping, may be shown as relevant circumstances for the consideration of the jury.

4. Testimony of a bystander offered by the accused in a murder trial, to show that a daughter of the deceased, while on the stand as a witness for the prosecution, exchanged signals with her mother, who was in the courtroom, and to show a similar exchange of signals between such witness and her sister when the latter was on the stand, is inadmissible.

5. Whether a circumstance offered in evidence by the accused in a murder trial is material or relevant is primarily for the decision of the trial court, and the exercise of its discretion will not be disturbed unless error to the possible prejudice of the accused is made reasonably clear; so that, where a bloody axe and a piece of iron pipe with which it is charged the crime was committed are exhibited to the jury in such a trial, and a witness for the accused after testifying that the axe showed, in addition to blood marks, outlines of finger marks, is asked to describe such finger marks, counsel for the accused stating that he wishes to show that they were not those of the accused, the refusal of the trial court to allow the question to be asked upon the ground that it is "too far fetched," is not reversible error, especially where it is not distinctly claimed by the accused that the so-called finger marks are capable of definite measurement and comparison with his hands and fingers.

6. In a prosecution for murder, based upon circumstantial evidence, it is not error for the trial court to refuse to allow counsel for the accused, in his address to the jury, to state that "on looking up the records of the court it will be seen that in 25 years there has been but one conviction upon circumstantial evidence."

7. Where in a murder case the trial court, in charging the jury upon the competency and meaning of circumstantial evidence, remarks that, "Many, probably a majority of convictions, are had upon circumstantial evidence," such remark will not constitute reversible error if the question of the defendant's guilt is submitted to the jury with full and fair instructions as to their duties and exclusive rights in its determination.

8. The refusal of the trial court in a murder trial to grant a prayer for instruction offered by the accused to the effect that there is no presumption as to the truthfulness or untruthfulness of his testimony, is not reversible error where the trial court so states in the charge to the jury and then correctly states more fully the rule upon the subject.

9. The control of counsel is largely a matter of discretion with the trial court, and that discretion is not abused in overruling

objections by the accused, in a murder trial, to language used by the prosecuting attorney in his address to the jury, where such language, although a severe denunciation of the crime and conduct of the defendant, and an impassioned appeal for his conviction, is clearly within the record and founded on facts admitted in evidence, some of which are contained in the evidence of the defendant himself.

No. 984.    Submitted May 3, 1900.    Decided June 5, 1900.

HEARING on an appeal by defendant from a judgment of conviction and sentence of the Supreme Court of the District of Columbia holding a special term for criminal business, in a prosecution for murder. " *Affirmed.*

The facts are sufficiently stated in the opinion.

· *Mr. D. W. Baker* and *Mr. Alexander Wolf* for the appellant:

1. That any circumstances or any peculiar circumstances are necessary for the purpose of qualifying the verdict is absolutely contrary to the decision of the Supreme Court of the United States. *Winston* v. *United States,* 172 U. S. 303. The jury must stand impartial as to the question of punishment, and the defendant has the right to inquire into the fact. *State* v. *Malvin,* 11 La. Ann. 536 ; *Stalls* v. *The State,* 28 Ala. 25. The defendant under the law has not only the right to exercise challenges for cause, but is entitled to a certain number of peremptory challenges, and he is to exercise these peremptory challenges in such a manner as he may see fit, and has the right to know exactly the status of the talesman's mind on the subject-matter of the indictment as well as on these questions of punishment.

2. Statements made by a defendant, either admitting another crime or attempting to commit another crime, are inadmissible. No evidence whatever, either of statements of the defendant or other evidence, is admissible to show the defendant guilty of another offense. *United States* v. *Mitchell,* 2 Dall. 357; *Boyd* v. *United States,* 142 U. S. 450; *Hall* v. *United States,* 150 U. S. 76. In criminal prosecutions all independent matters and independent crimes

disconnected from the crime then under investigation should be rigorously excluded, since such testimony only tends to prejudice the minds of the jury against the accused. *State* v. *Parker*, 96 Mo. 382; *People* v. *Gibbs*, 93 N. Y. 470; *People* v. *Drake*, 72 N. Y. 331; *People* v. *Sharp*, 107 N. Y. 467; *Comm.* v. *Jackson*, 132 Mass. 16; *People* v. *Ware*, 92 N. Y. 653; *Hester* v. *Comm.*, 95 Penna. 139.

3. The trial court erred in excluding the testimony of the witnesses Dougherty and McElhone. As a general rule of relevancy all facts are admissible in evidence which logically tend to prove or disprove the fact in issue unless excluded on some other ground. *Insurance Co.* v. *Weide*, 11 Wall. 438; 11 Am. & Eng. Encyc. L. (2d Ed.), 502, and cases cited.

4. The refusal of the court to discharge the jury on account of the fact that the juror Patterson was over the age of 65 years, and consequently incompetent to act as a juror, and the further action of the court in sentencing the defendant over his objection on the ground that the verdict found against him was rendered by an incompetent and unconstitutional jury, one of the members thereof being a non-juror at the time of the rendition of said verdict, was error for which the judgment must be reversed. *United States* v. *Angney*, 6 Mack. 66. In regard to the incompetency of this juror there can be no doubt. The act itself says no person shall be competent to act as a juror unless he be a citizen of the United States and a resident of the District, over 21 years and under 65 years of age, etc. It can not be said that the mere fact that this juror was qualified during part of the trial he was qualified to act as juror through the whole, for our statute using the words, incompetent to act as a juror, certainly means competent to render a verdict, the verdict being the most important duty on the part of the jury. *Shane* v. *Clarke*, 3 H. & McH. 101. The Constitution of the United States guaranteeing to the defendant a trial by a common law jury, the defendant was entitled to have

16 Ct. App.—32

a jury of twelve competent persons to render a verdict and he could not, unless given the right by the statute, waive his common law right to a jury, nor could any statute provide for a jury trial by less than twelve competent men, and no act of the defendant could deprive him of this right. *Hill* v. *People,* 16 Mich. 351; *Bond* v. *State,* 17 Ark. 290; *People* v. *O'Neil,* 48 Cal. 257; *Allen* v. *State,* 54 Ind. 461; *Hunt* v. *State,* 61 Miss. 577; Cooley's Const. Lim., 319, 320, and authorities there cited; *State* v. *Mansfield,* 41 Mo. 474; *State* v. *Myers,* 68 Mo. 266; *Cancemi* v. *People,* 18 N. Y. 128; *Thompson* v. *Utah,* 170 U. S. 343; *Kohl* v. *Lehlback,* 160 U. S. 293.

5. The improper language of the counsel for the Government, unrebuked by the court, after objection by the defendant, certainly influenced the jury in their deliberations, and the judgment should be reversed therefor. See *People* v. *Arlen,* 92 Cal. 284; *Crawford* v. *State,* 15 Tex. App. 501; *State* v. *Ulrich,* 110 Mo. 150; *State* v. *Fisher,* 124 Mo. 460; *Turner* v. *State,* 4 Lea. 206; *Maguson* v. *State,* 13 Ind. App. 303; *Washington* v. *State,* 87 Ga. 12; *Ferguson* v. *State,* 49 Ind. 34; *Conn* v. *State,* 11 Tex. App. 399; *Hall* v. *United States,* 150 U. S. 76; *State* v. *King,* 64 Mo. 591; *State* v. *Young,* 99 Mo. 682; *Earl* v. *People,* 99 Ill. 123; *State* v. *Baker,* 57 Kan. 541.

*Mr. Thomas H. Anderson,* United States Attorney for the District of Columbia, and *Mr. Thomas C. Taylor,* Assistant Attorney, for the United States:

1. The determination of the competency and qualifications of jurors upon their *voir dire* rests largely in the discretion of the trial court, and it is only in cases where manifest error to the prejudice of the accused is disclosed that such discretion will be disturbed. *Reynolds* v. *United States,* 98 U. S. 145.

2. Flight is admissible in evidence as an inculpatory circumstance indicative of guilt; flight and attendant

circumstances are admissible in evidence as tending to show guilt. Wharton's Crim. Ev., par. 750 (9th Ed.); Roscoe Crim. Law, 17, 18; *State* v. *Mallon*, 75 Mo. 355; *Whaley* v. *State*, 11 Ga. 123; *Revel* v. *State*, 26 Ga. 275: Id., 281; *Waite* v. *State*, 13 Tex. App. 169; *State* v. *Frederic*, 69 Maine, 400; *Dean* v. *Comm.*, 4 Gratt. 541; *Burrows* v. *State*, 38 Ark. 225.

3. The test as to the competency of Patterson to act as a juror in the case is not whether he attained the age of sixty-five years before the case was closed, but whether he was under sixty-five years of age at the time he was accepted and sworn as a juror. The record shows that when accepted and sworn he was under sixty-five years of age, and hence it follows that in so far as his age was concerned he was competent under the statute to act as a juror. But even if the ground upon which the motion was based furnished good cause for challenge, which is denied, such challenge should have been made either at the time the talesman was examined on his *voir dire* or before the jury was sworn in order that the validity of such challenge might have been then tried by the court. Not having seen proper to so challenge the talesman before he was sworn, the defendant must be held to have waived his right to thereafter challenge him upon that ground. The right to challenge, as well as the right of the court to try a challenge for cause or favor, ends with the swearing of the jury. *Queen* v. *Hepburn*, 7 Cr. 297. The general rule relating to the examination of jurors is that the discretion resting in the trial court will not be reviewed by an appellate tribunal unless upon manifest and palpable error injurious to the appellant. *Horton* v. *United States*, 15 App. D. C. 310; *Presbury* v. *Comm.*, 9 Dana (Ky.), 204. By the common law a juror was disqualified if he was under twenty-one or over sixty years of age, or was an alien or an outlaw; but if a man who had not these qualifications was called as a juror, he had to be challenged, if at all, for that cause before he was sworn. It was too late after he was

sworn. 1 Arch. Cr. Law, 163, note 1; 1 Hawk. Pl. Cr., Ch. 43, Sec. 1; *King* v. *Sutton*, 8 Barn. & Cr. 417; *Ex parte Phillips*, 10 Exch. 731; *Hill* v. *Yates*, 12 East, 229. See, also, 1 Bish. Crim. Proc., Sec. 932*a*; *United States* v. *McBride*, 18 D. C. 378; *People* v. *State*, 56 Mich. 154; *Reynolds* v. *United States*, 98 U. S. 158; *United States* v. *Cross*, 20 D. C. 392; *Croy* v. *State*, 32 Ind. 384; *Kohl* v. *Lehlback*, 160 U. S. 293.

4. The general rule governing the conduct of a prosecuting officer in the matter of argument is that he may always comment upon any matter of evidence in the case or upon any facts or circumstances reasonably inferable therefrom. Bishop's New Crim. Proc. Sec. 975.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. Between the hours of six and seven, on the afternoon of June 23, 1898, William H. Brooks and his wife were found in a small back room of their residence, in the city of Washington, unconscious from wounds inflicted upon their heads. The window of the room had been secured by nails and the door bolted on the outside.

An axe and a piece of iron pipe, both with blood and hair upon them, were found in the room. William H. Brooks died within a few moments after discovery. Mrs. Brooks finally recovered, but was unable to tell by whom the assault had been committed. Mrs. Brooks had about $2,070 in the drawer of a sideboard, the key of which she carried constantly, secured by a string about her neck and hidden from view. The money could not be found after the homicide, though immediate search was made.

There was evidence tending to show that appellant, Frank W. Funk, had been an occasional visitor at the Brooks house, that he knew Mrs. Brooks had money in her possession, and that a day or two before the homicide he had seen her take the key from her neck, open the drawer, and take out some change.

There was further proof tending to show that appellant took a room at a hotel or lodging house late on the same afternoon for one day, paying in advance, under the name of Frank Nicholson; that after changing clothes he left without notice and purchased a 1,000-mile ticket at the Pennsylvania railway station under the name of Edward Bald. He took a Baltimore & Ohio train the same night for New York.

He was finally arrested in August, 1899, in Columbia, Missouri, where he called himself Conly.

He was brought to trial and convicted of the murder in the Supreme Court of the District, and has been sentenced to death. From that judgment he has appealed.

2. The record shows that separate exceptions were taken by the defendant to the refusal of the court to permit certain questions touching their qualifications to be answered by each of nine persons who had been summoned as talesmen, and the first question to be determined arises on the errors assigned thereon.

These present substantially the same question, and may for convenience be considered as one.

Each talesman was interrogated by the court to ascertain whether he had conscientious scruples in respect of the infliction of capital punishment, or any prejudice against the substitution of imprisonment for life therefor.

After some general examination of these parties to test their impartiality, the counsel for defendant asked the following question:

" Suppose you as a juror, together with the other jurors, should find the defendant guilty, then it is incumbent on you under the law to impose a sentence—that is to say, whether the sentence shall be death, your verdict in that case being guilty as indicted, or your sentence qualified with the words ' without capital punishment'—would you require mitigating circumstances before you would render a verdict, or what circumstances would you require to qualify

your verdict and add thereto 'without capital punishment?'"

The same question substantially was propounded to each person. The court refused to permit answer to the question.

The view taken by the court of the limit of examination permissible on this point is illustrated by the following questions propounded by him:

"Q. The law, as it exists in the District of Columbia at the present time, requires a jury if it convict a person of murder to determine whether it will qualify its verdict by making the punishment confinement in the penitentiary during life instead of the death penalty. The law provides that the penalty shall be death unless the jury find to the contrary, and it is discretionary with the jury in each particular case to provide whether the punishment shall be confinement in the penitentiary, and so specify in its verdict. Have you any bias or prejudice in your mind against confinement in the penitentiary as a punishment for murder as would prevent you considering that question impartially should you agree to a verdict of guilty?

"Q. The law gives the jury the right to fix the punishment without regard to any fact in the case. They may be guided by the facts and circumstances as they please. There are no principles of law laid down by the court governing the jury upon that question. They have the right to qualify their verdict and fix the punishment at confinement in the penitentiary or not, as they please. The question is whether you can fairly consider that question?"

This view of the extent of the change of practice in the matter of testing the competency of jurors in trials for murder, made necessary by the recent change in the law by Congress, is, in our opinion, the correct one.

In the case of *Winston* v. *United States*, 172 U. S. 303, 312, it was said: "The right to qualify a verdict of guilty by adding the words 'without capital punishment' is thus conferred upon the jury in all cases of murder. The act does not itself prescribe nor authorize the court to prescribe any

rule defining or circumscribing the exercise of this right, but commits the whole matter of its exercise to the judgment and consciences of the jury. The authority of the jury to decide that the accused shall not be punished capitally is not limited to cases in which the court or the jury is of opinion that there are palliating or mitigating circumstances; but it extends to every case in which, upon a view of the whole evidence, the jury is of opinion that it would not be just or wise to impose capital punishment. How far considerations of age, sex, ignorance, illness or intoxication; of human passion or weakness, of sympathy or clemency, or the irrevocableness of an executed sentence of death, or an apprehension that explanatory facts may exist which have not been brought to light, or any other consideration whatever, should be allowed weight in deciding the question whether the accused should or should not be capitally punished, is committed by the act of Congress to the sound discretion of the jury and of the jury alone."

The sole question in that case was whether the court had the right in its charge to undertake the control in any respect of the discretion that had been committed to the jury. The foregoing extract from the opinion delivered by Mr. Justice Gray, that is relied on by the appellant as sustaining his contention, must be considered in the light of the question before the court. Those words lucidly illustrate the broad spirit of the amended act and explain the foundations of the untrammelled discretion which it was held Congress had intended to confer upon the jury. They can not be regarded as indicating or suggesting a proper test for the qualifications of jurors in such cases.

We see nothing in the act of Congress as interpreted which leads to any other reasonable conclusion than that the necessary test of the qualification of jurors in a trial of murder is that they shall have no bias in favor of or prejudice against either form of punishment.

They should stand indifferent between the Government

and the accused on this as on all other questions involved in the case. All that can reasonably be demanded by either the Government or the accused is that they come to this question, after the ascertainment of guilt, in this impartial state of mind, prepared to exercise clemency or not, according to their own judgments and consciences, unaided by the advice of the court, and guided only by the sense of their solemn responsibility, which is the performance of their whole duty to the Government as well as the accused.

Although there are several States of the Union in which statutes of the same purport have been in force for years, we have been cited to no case arising under them, nor have we discovered one, in which the question here raised has been decided. The failure to raise the question in some one of the many murder trials that must have been had in those States for decision on appeal is to a certain extent persuasive that an interpretation of those statutes in accord with the views we have expressed has been generally accepted.

Decisions in two of those States, where the statutes have been long in force, though not determining this very question, would seem, nevertheless, to embrace the conclusion we have reached within their governing principles. *State* v. *Melvin*, 11 La. Ann. 535; *Gonzalez* v. *State*, 31 Tex. Cr. Rep. 508–11. In the last of those cases, holding that a juror who had conscientious scruples against the infliction of capital punishment was subject to challenge by the State, it was said: "It was the duty of the court to see to it that a jury be organized, prepared and willing to assess either penalty as they should view the facts and circumstances."

It must be remembered, in construing the meaning of the act of Congress, that capital punishment necessarily follows the verdit of guilty unless the jury shall further agree to add thereto the qualification which reduces the sentence to imprisonment for life. It is reasonable, therefore, to presume that it was expected there should be something in the

case, trivial though it might appear to one not charged with the final responsibility, that would lead an unbiased and unprejudiced jury to this additional finding.   It would be difficult, indeed, if not impossible, for one—without bias or prejudice in respect of the penalty—to explain in advance of the hearing just what circumstances would induce him to recommend or to insist upon the recommendation of clemency; and, in our judgment, an attempt to probe his mind and conscience farther than to ascertain the existence of this necessary want of bias or prejudice would subject him to an ordeal not to be tolerated save under an express requirement of a statute.

Such minuteness of inquiry into the secret springs of emotion, sentiment and moral action as would follow the approval of the contention of the appellant in this case would not only tend to unduly annoy and oppress candid, conscientious and intelligent citizens, but also to exclude them from the jury service, with results disastrous to the just enforcement of the criminal law and the preservation of the public peace and order.

3. Another question relating to the competency of a juror who participated in the trial has been reserved by a special exception, and will be next considered, though not in the order of its assignment as error.

It appears from the bill of exceptions that Robert T. Patterson was called as a talesman and examined on December 12, 1899.   Having been asked if he had attained the age of sixty-five years, he answered that he was within ten days of that age.   No objection was made to him and he was duly sworn as a member of the jury.   The trial was prolonged and the verdict was not rendered until December 23.

On December 21 defendant called attention of the court to the then disqualification of Patterson by reason of his attainment of the age of sixty-five years, and moved the discharge of the jury.   The motion was overruled, and the point was again made on a motion in arrest of judgment.

The statute declaring the qualification of jurors provides that "no person shall be competent to act as a juror unless he be a citizen of the United States, a resident of the District, over twenty-one and under sixty-five years of age, and a good and lawful man who has never been convicted of a felony or misdemeanor involving moral turpitude." R. S. D. C., Sec. 872.

The contention of the appellant is that the juror became absolutely incapacitated at the moment that he attained the age limit of sixty-five years, and that the actual result of the trial was the rendition of a verdict by an unconstitutional jury of eleven men. In this we can not concur. In our opinion, the question of competency must be determined by the condition prevailing at the time the jury was impaneled. It is then the inquiry is made and the question of competency adjudicated, and to that time the requirement of the statute must relate. If competent then, the competency must be regarded as existing throughout the trial, notwithstanding that by reason of unexpected delays therein a juror may pass the age limit before the return of the verdict.

It is not reasonable to suppose that Congress contemplated a situation of this kind should have the same result as would death or sudden physical or mental incapacity. A statute is not to be given an unreasonable or absurd effect unless the same be unavoidable.

This conclusion renders unnecessary the consideration of some incidental questions that have been argued under this assignment of error.

4. The next assignment of error relates to the admission of certain evidence over the objection of the defendant. As recited in the preliminary statement, evidence had been offered tending to show that the defendant had registered at a hotel in Washington, within a few hours after the homicide, in the name of Frank Nicholson, and had purchased a 1,000-mile ticket at the Pennsylvania station in the name

of Edward Bald, and that he left on the same night for New York. Further evidence tended to show that on the next morning, June 24, 1898, he deposited $1,200 in a New York bank in the name of Edward Bald, and had some money remaining, and that he spent some time there visiting race-courses and the like. Other evidence tended to show that the authorities of the District of Columbia published circulars giving a brief account of the homicide, with a picture and description of the defendant and offering a reward for his apprehension. One of these was sent to each postmaster and chief of police of the cities and towns of the United States. It was also shown that the defendant had while in New York read in a newspaper an account of the murder, and that he was charged with its commission.

The Government then offered one James McFeely as a witness, who testified substantially as follows: That he was a constable at Altoona, Penna., in September, 1898; that on the second day of that month he arrested defendant— known to him as Edward Bald—upon a warrant for some minor offense, the nature of which was not stated. He took him to Altoona from Hollidaysburg, a distance of six miles, for preliminary hearing. In the course of conversation defendant said to witness: "Mack, you are a pretty good fellow. Do you do any work outside of Pennsylvania?" Witness said, yes, and asked why he had made the inquiry. Defendant said that he knew where a man was for whom a reward had been offered. He further said that the man would be hard to take; that he had killed a man for his money in some place not a thousand miles from Philadelphia; that the deceased had been killed in a hallway or back room of his house with an axe, and that the murderer had secured about $1,600. He further said that when he got out of the present scrape they could arrest the murderer and divide the reward. He then asked witness if he had seen any circulars describing such

an offense, and upon witness answering no, inquired if they kept such things in the mayor's office. To this witness answered, yes. There were circulars posted on the walls of the mayor's office, and after arriving at the city hall defendant requested witness to take him there to see them. He did so, and defendant inspected them. Witness did not look over the posters. Defendant said he did not see the one he was looking for. Defendant's case was put off for ten days, and witness returned with him to Hollidaysburg. The places were connected by two separate street car lines, and it was necessary to cross a small park from one to the other. Witness had secured defendant by fastening a handcuff upon his wrist and slipping its fellow upon his own. Whilst waiting for the car on the edge of the park defendant asked witness to walk up the road a little way, as he did not want to stand there with the handcuff on. They walked up the road, letting one car pass them. After they had gotten in the second car, defendant said to witness: "What do you suppose I had a notion to do with you?" Witness answered that he did not know, and further said : "What had you a notion to do with me?" Defendant said his notion had been to kill him. To this witness said : "You would be a fool to kill me to get away from a charge like this." He then. asked defendant: "What would you have done? How would you have gotten loose?" All that he could remember of defendant's reply was: "If I had gotten the handcuffs loose"—

How defendant got out of his "scrape" does not appear, but he left the place shortly after, and was finally arrested in Columbia, Missouri, where he called himself Conly.

Defendant objected to the last conversation stated above as occurring on the street car, on the ground that it was "not material to this case;" and reserved his exception when overruled.

It has been contended on the argument that this evidence tended to show a separate offense, or contemplated

offense, distinct from that of the trial and shedding no light thereon, and that it could have been introduced for no other purpose than to show to the jury the character of the defendant, when that character had not been put in issue by him.

Had this been the purpose, the admission of the evidence would have been error; but the Government claims that it was offered as 'part of the evidence of defendant's flight, concealment of identity and continued effort to escape arrest, and the bill of exception contains no recital of a specific ground of objection or admission. If the evidence was admissible for the purpose claimed by the Government, it can not matter that incidentally it may have injuriously affected the character of the defendant with the jury. The defendant could have asked a special direction or instruction to the jury limiting its consideration to the purpose of admission strictly. He did in fact ask such an instruction at a later stage of the case, having particular reference to facts showing other offenses testified to in his own examination as a witness, and the same was granted by the court. Proof of flight has always been held admissible as a circumstance from which, in connection with others, guilt may be inferred by a jury. Wharton's Cr. Law, Sec. 750. And this is conceded by the defendant, who offered and had granted a special instruction thereon. This was to the effect that presumption of guilt arising from flight is a presumption of fact, not of law, and is merely a circumstance tending to increase the probability of the accused being guilty, and is to be weighed as others; and, also, that if a doubt arise of defendant's guilt upon consideration of the whole evidence he must be acquitted notwithstanding his flight.

A second instruction, differing in form and somewhat in substance, was prayed and refused, but the refusal has not been assigned as error.

In many well considered cases it has been held, upon the

same principle authorizing evidence of flight and conceal-
ment, that other attendant and incidental facts may be
shown as relevant circumstances for the consideration of
the jury in cases of the character of this. Among these are
attempts to bribe a jailor or other officer; assaults upon or
attempts to kill officers arresting and holding accused upon
a different charge; attempts to break jail, and possession
of concealed instruments for that purpose, and the like.
*Whaley* v. *State,* 11 Ga. 123; *Revel* v. *State,* 26 Ga. 275; *State*
v. *Frederic,* 69 Me. 400, 403; *Dean* v. *Com.,* 4 Gratt. 541;
*State* v. *Mallon,* 75 Mo. 355; *State* v. *Jackson,* 95 Mo. 649, 661;
*State* v. *Duncan,* 116 Mo. 288, 310; *Palmer* v. *State,* 65 N. H.
216, 220 ; *Russell* v. *State,* 38 Tex. Cr. Rep. 590, 596; *Waite*
v. *State,* 13 Tex. Cr. App. 169, 178, 180; *Burris* v. *State,* 38
Ark. 221, 225.

Upon both principle and authority, we are of the opinion
that had the defendant actually assaulted McFeely, the fact
would have been admissible, and for the same reason his
confession of a contemplated assault for the purpose of
escaping was rightly admitted. It was made relevant by
the precedent proof of flight and change of name, and the
effort to ascertain if McFeely had seen the circular describ-
ing him and the offense charged against him, and was
securing him for the trivial offense, with such precaution,
in order to hold him for identification in connection with
the more serious one.

The fact that McFeely, who had no such knowledge or
intention, at once, and not unreasonably, expressed his
astonishment that his prisoner could have contemplated an
attempt to murder him for the purpose of escaping trial for
the trivial offense upon which he was then held, itself illus-
trates the pertinency of the same as one of a series of con-
nected circumstances tending to fasten the guilt of this
offense upon the defendant.

5. After the conclusion of the evidence for the prosecu-
tion, defendant offered a witness to prove that he sat in the

courtroom during the examination, as witnesses, of Maggie Brooks and Sophia Brown, daughters of the deceased. He then offered to prove that "when Sophia Brown was on the stand she would look at Mrs. Brooks, who was sitting in the courtroom, and the latter would make motions by nodding or shaking her head and putting her hands to her mouth, and that when Maggie Brooks was on the stand she looked at Sophia Brown, who was in the courtroom, and that the latter made similar motions." The evidence was excluded and an exception taken is made the ground of an assignment of error.

Had either witness been asked when testifying if she were receiving signals from or had given signals to others; the question might have been proper, though largely discretionary with the court, for the purpose of directing the attention of the jury to the circumstance; but independent evidence of the apparently meaningless and harmless shaking of heads, etc., would have introduced a collateral issue of no relevancy whatever. There was no error in its exclusion.

6. Another assignment of error is founded on an exception taken to the exclusion of evidence. It appears that a bloody axe and piece of iron pipe were found in the room where the homicide occurred. This bloody axe had been exhibited to the jury during the introduction of evidence on behalf of the prosecution. Defendant afterwards called a witness to testify concerning the appearance of the axe, and the following is what is shown in the bill of exceptions: "Q. Did the handle show anything other than blood marks? A. Yes; it showed outlines of finger marks." Witness was then asked to describe them, and the prosecution objected. The court said: "I do not see the materiality of it. There seems to be no controversy that there were blood marks on the axe and handle. What particular shape and form they were can not be material." Counsel for defendant replied: "I am not asking what the shape of the blood marks were,

but the finger marks on the handle of the axe—that was my question."

"The COURT: I do not see how that is material. Suppose that the witness should say that there was blood on each side of the space, and it had no blood on it, and he drew the inference from it that somebody's finger was where there was no blood, and that was the reason why there was no blood. Of course somebody's finger was there where there was no blood; in this homicide somebody's hand held it."

Counsel for defendant replied: "That is what we wanted to show. From the description of the finger marks, it was not the finger marks of the defendant—that is what we want to show." The court rejoined: "That is too far-fetched." The exception concludes here.

It seems from the foregoing recitals that what was called "finger marks" refers to a part of the handle probably covered at the time by the fingers and hand of the person who may have used the axe, and hence not marked with the blood that ran from the axe upon the handle. It was not distinctly claimed that these so-called finger marks were capable of definite measurement and comparison with the hand and fingers of the defendant. It must be borne in mind that the axe was before the court and jury when the evidence was offered. The hands of the accused must have been under observation also.

Now, whether a circumstance offered in evidence is material or relevant is primarily for the decision of the court on the trial, and the exercise of his discretion therein, under the conditions above stated, ought not to be disturbed unless error to the possible prejudice of the accused is made reasonably clear. After much consideration our conclusion is that there is nothing sufficiently definite and plain in the proceedings as recited that would justify us in saying that the court erred in holding the evidence irrelevant or "too far-fetched" to warrant the consumption of time in its consideration.

7. On the argument of the case before the jury the counsel for the defendant, in the course of a discussion of the character and weight of circumstantial evidence, began a statement to the effect that "on looking up the records of this court it will be seen that in twenty-five years there had been but———." Here he was stopped by an objection of the District Attorney. It is agreed that he intended to add the words "one conviction upon circumstantial evidence"—presumably in cases of this character. The court sustained the objection and the sentence was not finished.

The latitude in argument permissible to counsel is necessarily a matter largely within the discretion of the trial court, subject to review only in the appellate court in cases of manifest abuse in its exercise.

Wherever it is made reasonably clear that freedom of speech in respect of the issues and evidence submitted to the jury, which is the constitutional right of the accused and his counsel, has been unreasonably or arbitrarily abridged, it will constitute good ground for reversal and new trial; but no such condition is presented here. There is no intimation that counsel was restricted in his discussion of the defects or weakness of circumstantial evidence in general. Had he offered evidence on the trial to prove the fact which he intended to state in argument, it would have been inadmissible. It could not, therefore, be error to deny his right to state the same fact, as a fact, by way of argument.

8. The record shows that the court gave several special instructions, asked by the defendant, in relation to the presumption of innocence, and the necessary certainty of proof required to overcome the same, and to the effect that the jury are the sole judges of the credibility of the witnesses and the weight of the evidence. These were substantially repeated in the general charge. In this last the court instructed the jury at length in explanation of the difference between circumstantial and direct evidence, reiterating

16 Ct. App.—33

the necessity of the required weight to overcome the presumption of innocence. The foregoing was begun in these words:

"The effort of the Government is to prove a crime in this case by circumstantial evidence. This is not unusual. The law recognizes such evidence as competent to establish murder or any other crime when the circumstances are such as to leave no reasonable doubt of guilt. Many—probably a majority of convictions of crime are had upon circumstantial evidence. By circumstantial evidence in criminal cases is meant evidence which proves a series of facts from the existence of which the fact of guilt is inferred."

A special exception was taken to the sentence included in the above, "Many—probably a majority of convictions of crime are had upon circumstantial evidence;" and error has been assigned thereon. The remark had reference not only to evidence of *corpus delicti* in such cases, but also to the motive and intent of acts directly proved. It was a mere general statement of a matter of common observation, with no local or particular application that could possibly have had an undue influence upon the question of defendant's guilt, which was submitted to the jury with full and fair instructions as to their duties and exclusive rights in its determination.

The latitude permitted the courts of the United States in submitting a case to the jury is very great, provided no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the jury with no attempt to create prejudice. *Starr* v. *United States*, 153 U. S. 614, 625, and cases cited. The assignment presents no reversible error.

9. The next error assigned is the refusal of the court to give the eleventh special instruction asked by the defendant, as follows:

"11. The jury are instructed that there is no presumption as to the truthfulness or untruthfulness of the defendant's

testimony, but his testimony is to be considered by the jury taking all the circumstances of the case and all the other evidence into consideration in the same manner as they are to consider the testimony of every other witness in the case, and they are to give such weight to it as in their judgment it ought to have."

In the general charge, however, the court instructed the jury as follows:

" The credibility of each and every witness who has testified in this case, including the defendant, and the weight to be given to his or her testimony, is a question solely for you. Some of the usual tests, which amongst others it will be proper for you to apply, are the appearance and deportment of the witnesses, his or her prevarications, reluctance to answer, apparent bias, or interest in the result of the trial, if any, the intrinsic probability or improbability of the story of the witnesses as told, and its harmony or incongruity, with other facts in the case which you may find to be established beyond a reasonable doubt. You should give such weight, and such weight only, to the testimony of each witness in the case, including the defendant, as you may, under all the circumstances, think it is entitled to.

"Counsel for the defendant have requested the court to instruct you that there is no presumption as to the truthfulness or untruthfulness of the testimony of the defendant; which I do. It is for you to consider it, and apply to it the tests just enumerated, and any others that may occur to you, and give it such weight, if any, as you may think, under all the circumstances, it is entitled to. You may accept it as true, and you should do so if, after a careful consideration of it in connection with all the other testimony and circumstances, you believe it to be true. You may reject the whole of it and give it no weight whatever, and should do so, if you believe it to be false. You may accept part or parts of it as true and reject the residue, if you so believe."

Any error in the refusal of defendant's prayer was cured

by this, which contains all that the defendant had a right to insist upon.

10. The last assignment of error is founded on an exception taken to language used by the prosecuting attorney in his address to the jury. Without consuming space with stating this language, it is sufficient to say that it was nothing more than a severe denunciation of the crime and conduct of the defendant, followed by an impassioned appeal for his conviction. Counsel are often led to extremes in the heat of debate, and some reasonable allowance is necessary therefor. Such extremes are not to be commended, especially on behalf of the prosecution, and we very much doubt if they are as potent in their effect upon juries generally as are calm, logical and earnest arguments addressed to their reason and sense of duty. However, as has been said before and as we have declared in several preceding cases, the control of counsel is largely a matter of discretion with the trial court.

We find no abuse of that discretion here, for the words of counsel were clearly within the record. They were founded entirely upon facts admitted in evidence, some of which were contained in the evidence of the defendant himself.

Having considered all of the questions presented for our determination and found no error in the proceedings on the trial, the judgment must be affirmed.          *Affirmed.*

A motion to stay the mandate to the court below pending an application to the Supreme Court of the United States for a writ of *certiorari* was denied. A petition for a writ of *certiorari* was subsequently filed in the Supreme Court of the United States and, on the advice of the Attorney General, a reprieve was granted the defendant by the President pending the decision of that court on the application.