## COPELAND v. UNITED STATES.

(Court of Appeals of District of Columbia. Submitted October 10, 1924. Decided November 3, 1924.)

No. 4133.

**1. Homicide ⬤⟹171(3)—Evidence as to homicides committed by defendant held admissible in prosecution for murder committed in effort to avoid arrest therefor.**

In prosecution for murder of police officer, claimed to have been killed by defendant in his effort to avoid arrest for murder of two other persons several hours before, evidence as to the first homicides *held* admissible.

**2. Criminal law ⬤⟹371(12)—Court's statement that evidence concerning other homicides by defendant was admitted in part to show defendant's motive held not error.**

In prosecution for murder of police officer, claimed to have been killed by defendant in effort to avoid arrest for murder of other persons several hours before, court's statement to jury that evidence concerning first homicides was admitted in part to show defendant's motive in firing at officer *held* not error.

**3. Homicide ⬤⟹253(3)—Defendant, killing officer to avoid arrest, held guilty of first degree murder.**

Defendant, who killed two persons and fled to brother's house, knowing that he would be pursued by officers, and took revolver in his hand, determined to kill any officer who attempted to arrest him, and in fact did kill an officer in the execution of such deliberate purpose, *held* guilty of first degree murder.

**4. Criminal law ⬤⟹722(2)—Prosecuting attorney's remark in argument that defendant would kill jurors if he had gun held improper.**

District attorney's statement, in argument to jury, that if defendant had a gun "he would not hesitate to kill every one of you 12 men," *held* improper.

**5. Criminal law ⬤⟹730(12)—Improper remark by prosecuting attorney not ground for reversal, in view of court's immediate admonition to jury and general charge.**

In murder prosecution, prosecuting attorney's statement to jury that, if defendant had a gun, he would not hesitate to kill all 12 jurors, *held* not ground for reversal, in view of court's immediate admonition to jury and careful and comprehensive instructions in general charge.

**6. Homicide ⬤⟹250—Evidence held to sustain conviction for murder.**

In prosecution for murder of police officer, committed by defendant in effort to avoid arrest for murders previously committed, evidence *held* to sustain conviction.

Appeal from Supreme Court of District of Columbia.

Herman L. Copeland, otherwise known as Herbert L. Copeland, was convicted of murder in the first degree, and he appeals. Affirmed.

B. L. Gaskins and R. A. Hughes, both of Washington, D. C., for appellant.

Peyton Gordon and J. H. Burnett, both of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, ROBB, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

MARTIN, Chief Justice. The appellant, Herman L. Copeland, was indicted, convicted, and sentenced upon a charge of murder in the first degree, for the killing of one David T. Dunigan on May 21, 1918, in the District of Columbia. He prays for a reversal.

The testimony taken at the trial is presented by a bill of exceptions and tends to prove the following facts, to wit:

That the defendant and his wife resided in a house on I street in the city of Washington; that for some time preceding May 21, 1918, he had been working for a company at Indian Head, Md., but he spent that day at his home with his wife; that a certain lawsuit in which the company was interested was set for trial upon the following day at La Plata, Md., the defendant being wanted there as a witness, and accordingly two of the company's employees, namely, Niles and McParland, came to Washington in an automobile on that evening, with a view to taking the defendant back with them; that they arrived in the city late in the evening and started for the defendant's home, but before going there they stopped at a police station and induced a police officer named Conrad to accompany them; that the two civilians and the police officer, who was in uniform, went in the automobile to the defendant's home, arriving there about midnight, when the car was parked in the street in front of the house, and Niles remained standing near it, while McParland and the officer went up the front steps leading to the defendant's rooms; that a woman who was a tenant in the same house was seated upon a porch near the front door, when the two men came up and asked for the defendant; that the front door of the house leads into a small hall, with an inner door opening into the defendant's rooms a few steps distant, and the two men went into the hall and stood there awhile outside of the defendant's door, which was then closed, calling the defendant by name and speaking to him; that the woman on the porch did not hear what else they said, nor did she hear any response from within the defendant's room; that after a time the key was turned in the lock, the door opened, and the two men in the hall moved toward the door, when two shots were fired in rapid succession from within the room, almost instantly killing the two men, whose bodies fell

near to each other in the hallway; that Niles heard the shots, and saw some one starting to get out of a window of the defendant's room, whereupon he called to the person to go back, when the latter fired a pistol at Niles and then retreated into the room again; that neither of the slain men used a weapon, nor had one in sight, except that the policeman carried his stick. There is no testimony concerning what was said between the defendant and the slain men while they stood in the hallway before the shooting, but the defendant, in a statement made that evening to the witness Barnes, and also in a statement made to an officer after his arrest, gave an account of the affair.

The record contains no proof that either Niles or McParland was an officer of the law, although the latter was referred to by some of the witnesses as a sheriff, nor is it clear that either carried a subpœna for the attendance of the defendant as a witness at the trial, although it is in the evidence that McParland held a paper, which remained in his hand after he was shot. Nor does the record affirmatively disclose the motive which influenced the two men to have the policeman accompany them to the defendant's home.

The record furthermore tends to prove that the defendant fled from his house after the shooting and went to the home of his half-brother, Barnes, which was on Carrolburg street, at some distance from the defendant's home; that Barnes had retired for the night, but was awakened by his wife when the defendant came to the house; that Barnes went to the door and found the defendant standing there with his revolver in his hands, and defendant continued to hold his revolver thus all the time that Barnes saw him; that the defendant told Barnes that he had killed two officers, and wanted to get somewhere out of the way, for he was satisfied the officers would make his wife bring them to Barnes' house, and he did not want any trouble there on account of Barnes' wife; that Barnes told him to come into the house, where the two men and Mrs. Barnes talked for a moment, whereupon the latter exclaimed, "Lord, there is somebody now; I believe it is them;" that in fact a number of police officers, led by Lieutenant David T. Dunigan, having learned of the homicide and seen the bodies of the slain men, had made pursuit of the defendant and were then surrounding Barnes' house, this being about two hours after the homicides; that Dunigan looked through the window and saw the defendant in the room, and then, accompanied by Police Sergeant Beckley, entered through the front door, the testimony being conflicting as to whether the door was opened for them, or whether they burst it in; that instantly, when they rushed through the door with Dunigan in the lead, the light was extinguished and a shot was fired from within, and Dunigan shouted, "I am shot in the leg; get that man," but before he said this there was a second shot fired; that one of the two shots was fired by Dunigan, the other by the defendant, Barnes testifying that Dunigan fired first, but Beckley and another officer, Bremerman, who was outside the building, testifying that the first shot was much the louder of the two, and since the defendant's revolver was 45-caliber, while Dunigan's was but 32, this testimony tended to prove that the defendant fired the first shot; that the defendant's bullet severed the femoral artery in Dunigan's left leg, and caused his immediate death; that the defendant attempted to escape through a rear window of the house, but was driven back by a fusillade of bullets from the policemen who were stationed there, and after returning into the house he was found under a bed in the rear room, suffering from several wounds. It was for the homicide of Lieutenant Dunigan that the defendant was indicted, tried, and convicted in this case.

The defendant did not become a witness at the trial, but the witness Barnes related what the defendant said to him about the first homicides, when he came to his house as aforesaid. Barnes testified upon this subject as follows:

"I went to the door, and I says: 'What in the world is the matter?' He says: 'I have killed two officers.' I says: 'Two officers?' He says: 'Yes.' I says: 'What in the world is the trouble?' He says: 'Well, they came to my house after me.' He says: 'I was summoned to go down to Indian Head as a witness, and I was sick, as you know'—which he had been sick for a day or two. And he says: 'I told them that I couldn't be down there to-day, but I would come to-morrow.' And they said: 'No, you are going to-night, you damned black son of a bitch, you.' I told them: 'I don't know whether I will or not. Don't be too sure. I am sick. I don't feel like going, but I will be there to-morrow.' And they says: 'No, you damned black son of a bitch, you are going to-night.' So he goes back into his house. When he goes back in the house, they rush in there, and he goes back and gets his gun, and he shot both of them. And he went out—went out of the house, and he came to my house."

To an officer, who asked the defendant, after his arrest, why he shot when he knew he was surrounded by police, the defendant replied that "that was the only way he seen out." When asked if he did not know that there were policemen there, as they were in uniform, he replied, "Yes."

[1] It is contended on behalf of the appellant that it was error for the trial court to permit in evidence the detailed and circumstantial statements of the witnesses relative to the first homicides and the location of the bodies of the slain men when found by the officers and when viewed by the witnesses. It is contended with respect to the latter point that it did not appear that the bodies had remained in the same position from the time they fell until they were seen by the witnesses in question. And in general it is contended that the details concerning the first homicides improperly tended to inflame the minds of the jury against the defendant. It is conceded that it was permissible to show the fact that these homicides had taken place, but it is contended that the government introduced such repeated and detailed accounts thereof in evidence as unduly to prejudice the minds of the jury against the defendant. We think, however, that these contentions are not supported by the record. As to the location of the bodies, the testimony tended to show that they remained where they fell until removed by the officers; and as to the general objection to such testimony, it is apparent that the first homicides were so immediately connected with the one for which the defendant was on trial that the latter could not be considered without an account of the former. See McHenry v. United States, 51 App. D. C. 119, and authorities cited therein. Moreover the court carefully instructed the jury upon this point, as appears by the following extract from the charge:

"There has been introduced in this case, apart from the evidence as to what happened on Carrolburg Street, evidence as to a previous killing on I Street. That evidence has been admitted for two reasons: The first reason, to show whether or not officer Dunigan and his associates had reasonable ground to believe that a felony had been committed; and, secondly, to show the motive that the defendant had in the killing at Carrolburg Street.

"Now, you cannot use this evidence for any other purpose, and you should be very careful about this. It is very natural for a man to feel that if a man has killed two men, and kills another, that he must have done the killing wrongfully. But that is not the question for you to determine. You are simply to determine the issues as to the killing on Carrolburg Street, and you should carefully refrain from allowing any prejudice, and feeling about any other killing to have any weight with you in determining the fact of that killing except for the two purposes which I have mentioned."

[2, 3] The counsel for appellant object to the trial court's statement to the jury that the evidence concerning the first homicide was admitted in part to show the motive which actuated the defendant when he fired at Dunigan. We think, however, that there was no error in this, for the mental attitude of the defendant toward Dunigan at the time of the second shooting could not properly be understood without a disclosure of the circumstances which led to the presence of both of them at the Carrolburg house, showing Dunigan's reason for pursuing the defendant, and the defendant's knowledge of the fact. These circumstances reflect upon the motive of the defendant when he shot the officer, and tend to disclose whether he was acting in self-defense, or was carrying out a matured intent and purpose to kill any officer who attempted to arrest him. McHenry v. United States, supra. And it should be said that if the defendant, after the first homicide, fled to his brother's home, knowing that he would be pursued there by officers seeking to arrest him upon a charge of murder, and that he took his revolver in his hand determined to kill any officer who attempted to arrest him, and if he killed Dunigan in the execution of that deliberate purpose under the circumstances which the testimony tends to disclose, he would be guilty of murder in the first degree as found by the jury. 5 Corpus Juris, p. 399; 29 Corpus Juris, p. 1093, "Homicide"; Pritchett v. Sullivan, 182 F. 480, 104 C. C. A. 624; Commonwealth v. Phelps. 209 Mass. 396, 407, 95 N. E. 868, Ann. Cas. 1912B, 566.

It appears from the record of the trial that one of the counsel for the defendant when addressing the jury spoke as follows:

"Yes; and in approaching a matter of the delicacy of this case—this is a delicate situation. We had just as well come up here and meet the issue as it really is. It is a delicate one. We do not want you to believe that Copeland feels absolutely callous; that he is glorying in anything that has happened. No; regretting it, tearfully; regretting it, regretting the necessity that was put upon him to keep his rights under the

law, being taken away from him. That is right."

After the conclusion of the argument of defendant's counsel, the district attorney addressed the jury in the closing argument, and among other things spoke in reference to the language above quoted as follows:

" 'I don't want you to believe that Copeland is callous.' - Why, gentlemen of the jury—callous? What does he mean by 'callous'? If Copeland had a gun right now, gentlemen of the jury, I submit to you he would not hesitate to kill every one of you 12 men—"

The defendant's counsel interposed an objection at this point, and asked that a juror be withdrawn and a mistrial be declared, because of the remarks of the district attorney. The following thereupon took place, to wit:

"The Court: I refuse your motion; but I do not recall any testimony in the case to justify either the argument or the other. As to the testimony in the case on that question.

"Mr. Gaskins: If your honor please, I submit that Colonel Johnson's argument was based fairly on the testimony. The testimony is that the defendant said to Beckley, in his confession, that when he got down there he was excited. I will read it to your honor, if necessary.

"The Court: I will let the jury determine that. As to the other question, I do not think it is a question of what the defendant might do; it is a question of what the defendant did.

"Mr. Emerson: I was merely replying to counsel's argument, if your honor please.

"The Court: I think you may disregard that argument."

[4, 5] It is contended on behalf of the appellant that this was prejudicial misconduct upon the part of the district attorney, such as to require a reversal of the judgment of conviction. We think that the language in question was improper and reprehensible, but the court's immediate admonition to the jury, together with the careful and comprehensive instructions contained in the general charge, lead us to sustain the action of the trial court in refusing to declare a mistrial on that account, or to grant a new trial because thereof.

[6] The testimony was sufficient to support the verdict of the jury, and upon a careful review of the entire record we are convinced that it is our duty to affirm the judgment.

It is affirmed.