**John N. SMITH, Appellant,**

v.

**UNITED STATES, Appellee.**

**James D. BRINKLEY, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 7051, 7085.**

District of Columbia Court of Appeals.

Argued Sept. 13, 1973.

Decided Dec. 14, 1973.

Frederick S. Hird, Jr., Washington, D. C., appointed by this court, for appellant Smith.

Silas J. Wasserstrom, Washington, D. C., appointed by this court, for appellant Brinkley.

Joseph B. Valder, Asst. U. S. Atty., with whom Harold H. Titus, Jr., U. S. Atty., John A. Terry and Charles J. Harkins, Jr., Asst. U. S. Attys., were on the brief, for appellee.

Before KERN, GALLAGHER and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

Appellants in this case, John N. Smith and James D. Brinkley, were tried jointly before a jury and convicted of armed

robbery[1] and assault with a dangerous weapon.[2] They appeal from their convictions, jointly and separately assigning various errors which will later be discussed. We affirm Smith's conviction for armed robbery, find the assault count was merged therein, and reverse both the convictions of Brinkley.

At 2:30 a. m. on July 20, 1972, the victim, John A. Webster, received a phone call from a person who identified herself as "Carolyn". The caller asked Webster if he would pick her up at 52nd and Division Avenue and take her home. Webster agreed and drove to that address. He did not see her there, but after circling the block encountered Janis McIlwain, who was known to him, and who told him that Carolyn couldn't go. When she asked him to give her a ride home, Webster agreed. While sitting in the car in front of her home his door was yanked open by a man, later identified as appellant Brinkley, who pointed a gun at him and told him to get out of the car. The man led Webster to an alley where he took from him his watch, valued at $365. His accomplice, later identified by Webster as Smith, took $1200 in cash from Webster's wallet and front pocket. Webster called the police and reported the incident.

On August 31, 1972, plainclothesman Robert Pettis of the Metropolitan Police Department showed Webster nine photographs, two of which were of appellants. (Earlier Pettis had obtained information as to the identity of appellants from Janis McIlwain.) Webster selected the photographs of appellants, later identified the two men in a lineup, and again identified them at trial.

On November 3, 1972, six days before trial, Officer Pettis was at the home of Janis McIlwain, a prospective government witness, when someone knocked at her front door. He went to the kitchen where he was able to overhear a conversation between Miss McIlwain and the visitor. Pettis testified that he heard a male voice, which he recognized to be that of appellant Smith, say the following to Miss McIlwain:

> "You should have kept your mouth shut as to who James and I were. You let that damn black detective fool you into telling us [sic] who we were."

Pettis further testified that he heard the voice say

> that he and James could get fifteen years for this and that he was not going —or James—neither one was not [sic] going to go and serve fifteen years in jail and leave their families unless they took her with them.

Miss McIlwain did not testify.

At the trial Officer Pettis admitted that he had told an untruth at the preliminary hearing when he testified under oath that he did not know if there were any other witnesses to the crime (other than Webster). In fact Officer Pettis knew that Janis McIlwain had witnessed the crime. Pettis' explanation for having lied was that he was attempting to protect Miss McIlwain. The trial judge refused to give the standard instruction concerning testimony of an admitted perjurer instead giving his own instruction regarding a witness who has admittedly lied under oath. The instruction did not use the word perjury and indicated that the explanation for the untrue testimony might be considered in evaluating the witness' testimony.

Both appellants assign as error the trial court's refusal to give the standard jury instruction regarding testimony of an admitted perjurer,[3] with respect to Officer Pettis' testimony.

---

1. D.C.Code 1967, §§ 22–2901, 22–3202.

2. D.C.Code 1967, § 22–502.

3. "The testimony of an admitted or convicted perjurer should be received with caution and scrutinized with care." District of Columbia Bar Association, Criminal Jury Instructions for the District of Columbia, No. 2.24 (2nd ed. 1972).

■ There is no reason to believe that only the exact wording of the standard jury instruction will adequately inform a jury as to the need to "receive with caution and scrutinize with care" the testimony of one who has previously lied under oath. A comparison of the standard jury instruction (*see* note 3, *supra*) with the instruction given by the trial court judge [4] reveals that the instruction given contained both elements of the standard instruction. It recited that Officer Pettis admitted he lied under oath, a reasonable definition of perjury, and it told the jury that Pettis' testimony was to "be received with caution and scrutinized with care", the exact words of the standard instruction.

Appellants claim, however, that the instruction was erroneous insofar as it additionally told the jury that it could weigh the explanation given by Officer Pettis for having lied. We think it entirely reasonable for the judge to inform the jury that they could take into account, in evaluating Pettis' testimony, his explanation for having previously lied. When a similar situation arose in United States v. Ross, 322 F. 2d 306, 307 (4th Cir. 1963), where a witness admitted to having given perjured testimony before the grand jury because of his fear of retaliation, the court there said:

> His admission of his earlier inconsistent testimony *and his explanation of it created issues of credibility which were properly submitted to the jury.* When the Court clearly instructed the jury that, in considering the credibility of a witness, they might take into account his earlier inconsistent statements, it was not essential that the Court also instruct the

jury further as to the weight to be given the testimony of a perjurer.

> The jury was entitled to accept as true the trial testimony of the bellboy. If it believed it, as it must have. . . . (Emphasis added.)

We find no error in the court's instruction on perjured testimony.

■ Appellant Smith cites as error the admission into evidence against him, over his objection, of Officer Pettis' testimony as to the conversation he overheard at Miss McIlwain's apartment between Smith and Miss McIlwain. This evidence, *supra,* consisted of a threat by Smith against Miss McIlwain concerning testimony she might give against him. Inextricably entwined in the threat was language which constituted implied admissions of participation in the crime charged. Smith contends that this evidence constituted evidence of another crime (obstruction of justice) and as such it could not be admitted against him unless it was shown that its probative value outweighed its prejudice.

In Bradley v. United States, 140 U.S. App.D.C. 7, 11–12, 433 F.2d 1113, 1117–1118 (1969), the court commented on the admissibility of evidence of crimes other than those with which the defendant has been charged.

> Few doctrines are more firmly established than the "principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed

---

4. Now, the testimony of an admitted teller of something less than the truth—I hesitate to use the word "perjurer." The testimony of one who has admitted he lied previously under oath should of course *be received with caution and scrutinized with care.* But you should consider any such testimony and the evidence of any such fact along with all of the other matters which I have indicated to you in determining whether or not to accept as true and accurate the testimony of the witness given to you here today.

Now, this instruction applies particularly to the testimony of the officer, who, as counsel has appropriately indicated, has admitted that under oath in a prior proceeding he gave false answers. He's explained to you why. It is for you ladies and gentlemen to weigh that, to weigh his explanation, and to consider his testimony given here today in determining whether or not you accept as true and accurate that testimony which you heard from this witness stand from that officer today. . . . (Emphasis added.)

the crime charged." . . . (Emphasis in original, footnote omitted.)

The case before us does not fall within the above doctrine regarding the inadmissibility of evidence of other crimes since the evidence was not admitted for the purpose of proving "disposition to commit crime"; it was, rather, admitted directly to prove guilt, inasmuch as it contained an admission of complicity in the crime.

What we have before us is a situation where an admission, directly relevant to guilt, is entwined with other evidence, a threat, such other evidence tending to prove another, but unrelated criminal act, obstruction of justice. Smith contends that the otherwise admissible evidence of the admission is rendered inadmissible by the presence of the threat evidence. We disagree.

In Bradley v. United States, *supra* the court said that (quoting 2 J. Wigmore, Evidence § 416 (3d ed. 1940))

> "where a circumstance is relevant for some purpose, the incidental revelation, in offering it, of *other criminal conduct* by a defendant does not stand in the way of receiving the evidence." [140 U.S. App.D.C. at 13, 433 F.2d at 1119 (emphasis in original).]

The court, however, also suggested that such evidence though relevant would not be admissible when its prejudicial effect outweighed its probative value. The rule recited was that

> evidence of other offenses is *admissible when substantially relevant to the offense charged;* inadmissible when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it, but otherwise inadmissible. . . . [Harper v. United States, 99 U.S.App.D.C. 324, 325, 239 F. 2d 945, 946 (1956) (emphasis added).]

That evidence of an admission of complicity in a crime is highly probative as being "substantially relevant to the offense charged", is beyond question.[5] The fact that its use results in the revelation of other criminal activity is merely incidental. The testimony was therefore admissible.

In People v. Cruz, 260 Cal.App.2d 55, 66 Cal.Rptr. 772 (4th Dist. 1968), cited by Smith, it was held that evidence of a threat against a prosecution witness, made *after* the witness had testified, lacked the probative value necessary to overcome its prejudicial effect and therefore was inadmissible. The only relevance of this evidence stemmed from the inference that only a guilty person threatens witnesses; there is no indication in the case, as reported, that the threat contained an admission of complicity in the crime charged, which factor gives the evidence in the instant case probative value independent of any inference which may be drawn from the threat itself.

■ Smith further contends that, even if the testimony was admissible, it was admissible for the limited purpose of showing consciousness of a weak case and not to prove guilt, and that the jury should have been so instructed. Since we have found that the testimony was admissible as an implied admission of guilt, it could be used directly to show guilt and no limiting instruction was necessary. We note further that no objection was made at trial to the court's instruction on this matter. In a case very similar to this one, United States v. Turner, 157 U.S.App.D.C. ——, 485 F.2d 976 (1973), appellant claimed that the trial court's limiting instruction to the jury, as to evidence that he had sought to bribe a witness, was inadequate. The court found that the bribe attempt was an admission by conduct, admissible as direct evidence of guilt, and that defects in the limiting instruction could not be error since no limiting instruction was necessary. There

---

5. The trial court heard argument on the question of whether the probative value of the evidence outweighed the prejudice to the defendant and concluded that it did.

being no errors affecting Smith's rights, his conviction for armed robbery is therefore affirmed.

■ We must, however, vacate Smith's conviction on the assault with a dangerous weapon count since we have held that such a charge is merged with the armed robbery count. Skinner v. United States, D.C.App., 310 A.2d 231 (1973); United States v. Johnson, 155 U.S.App.D.C. 28, 475 F.2d 1297, 1298–1299 (1973).

■ Appellant Brinkley makes an independent attack on the admission of the testimony concerning the threat made by Smith to Miss McIlwain. Brinkley claims that the admission of that evidence denied him his Sixth Amendment right to confront a witness against him, since the admission made by Smith also implicated him and he was unable to cross-examine the declarant, Smith.[6] Brinkley claims that the judge's instructions to the jury, to consider the evidence only as to Smith, given when the evidence was admitted and also in the court's final instructions to the jury, were insufficient to correct the error under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

*Bruton* held that it was a violation of a defendant's Sixth Amendment right to confront witnesses to allow into evidence, in a joint trial, an extrajudicial statement of a codefendant which implicates the defendant. In that opinion the Supreme Court held that a cautionary instruction to the jury, telling it not to consider the statement against the nondeclarant defendant, was an inadequate protective measure against the possible prejudice to him.

In *Bruton* petitioner and one Evans were jointly tried for armed robbery. A postal inspector testified at trial that Evans confessed to him that he, Evans, had committed the robbery and that petitioner was his accomplice. Evans did not take the stand. The trial judge twice cautioned the jury,

once at the end of the government's direct case, and again in his final instructions, that this evidence could only be considered against Evans, the declarant. The Supreme Court held that petitioner's Sixth Amendment right to confront the witnesses against him had been denied by the admission of Evans' incriminating statement which also implicated petitioner, since the declarant was unavailable for cross-examination. The Court rejected the idea that the jury could perform the "mental gymnastics" required to refrain from considering Evans' statement of petitioner's guilt in reaching a verdict as to petitioner. It held that a cautionary instruction in this situation was inadequate protection for petitioner's rights "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt. . . ." *Bruton, supra* at 126, 88 S.Ct. at 1622.

The government seeks to avoid the impact of *Bruton* on the ground that the extrajudicial statements in *Bruton* were made in a written confession while the statements in the present case were made in a conversation overheard by a police officer. Appellee contends that this proposition is supported by United States v. Lemonakis, 157 U.S.App.D.C. ——, 485 F.2d 941 (1973). In *Lemonakis* appellant Enten was jointly tried with Lemonakis on various felony charges involving burglaries allegedly committed by them. The government introduced recordings of conversations between Lemonakis and another party which appellant Enten claimed contained incriminating references about him. He claimed that since he could not cross-examine either declarant (Lemonakis did not take the stand and the other party had died) he was denied his Sixth Amendment right to confront the witnesses against him and that the *three* cautionary instructions given by the trial judge, telling the jury that the recordings were not admissible against him, were ineffective under *Bruton, supra.*

---

6. Smith did not testify.

The court rejected appellant's "Bruton" claim for the following three reasons. First, it questioned whether the statements even incriminated Enten since they were not inconsistent with his defense. Second, it thought that one of the declarants lacked credibility since he was a government informant and the jury was therefore less likely to believe his statements. Third, it noted that the statements were not contained in a confession and opined that for this reason they were less incriminating than in *Bruton*. Based on these *three* considerations the court found that the statements were not the "powerfully incriminating extrajudicial statements of a codefendant" present in *Bruton*, and therefore that the trial court's cautionary instructions would dispel the prejudice inherent in the admission of the evidence.

The case before us does not present the same type of considerations which led the court in *Lemonakis, supra,* to conclude that the extrajudicial statements were not "powerfully incriminating". In the present case there is no doubt, such as was present in *Lemonakis,* as to the incriminating nature of the statements. The statement directly implicated appellant Brinkley in the crime. Appellant Brinkley did not take the stand and no defense was presented on his behalf which would have been consistent with acceptance of the truth of the statements. In the present case the declarant was an accused accomplice of the appellant, whose statement was as much against his own interests as it was against appellant's, rather than as in *Lemonakis* an informant whose motives and assertions were suspect since his very purpose was to incriminate other people. This case is similar to *Lemonakis* only insofar as neither involve confessions while *Bruton* does.

The court in *Lemonakis* believed that the extrajudicial statement of an informant was not as "powerfully incriminating" as the confession in *Bruton.* We agree, but believe that this extrajudicial admission of guilt by an *accomplice* is as incriminating as a confession by an accomplice. While there is sometimes a motive for shifting blame in a confession, this is less likely to be a possibility when the declarant is making a statement indicating complicity in a crime which unbeknownst to him is being overheard by a police officer.

The extrajudicial statements in this case were as "powerfully incriminating" as they were in *Bruton* and we are constrained to follow the ruling in *Bruton* that the cautionary instruction to the jury, that they not consider the statements as against the nondeclarant appellant, was insufficient to prevent prejudice to him.

■ We are asked by appellee to find that even if there was a "Bruton" error, such error was "harmless". Appellee appropriately refers us to recent Supreme Court cases finding "Bruton" errors harmless.[7] In each of these cases the Court found the other evidence of guilt, independent of the evidence erroneously admitted, so "overwhelming" that there was no "reasonable possibility that the improperly admitted evidence contributed to the conviction." Schneble v. Florida, 405 U.S. 427, 432, 92 S.Ct. 1056, 1060, 31 L.Ed.2d 340 (1972).

In the present case the *only* evidence against appellant was an eyewitness identification by the victim-complainant. In none of the three Supreme Court cases cited at note 7, *supra,* was there such a small quantum of independent evidence,[8] as is

7. Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) ; Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972) ; Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed. 284 (1969).

8. In *Brown,* supra at 224–226, of 411 U.S., 93 S.Ct. 1565, the independent evidence consisted of a full confession by petitioner, photos of him during commission of the crime, and his arrest while he was transporting stolen goods. In *Harrington, supra* at 252–253 of 395 U.S., 89 S.Ct. 1726, petitioner admitted: that he was at the scene of the crime, that he fled and that he shaved his moustache and dyed his hair. Another

presented in this case. While the identification testimony of the complainant here was specific and clear, giving the appearance of certainty, we are unable to make a finding that there was no "reasonable possibility that the improperly admitted evidence contributed to the conviction" and we must therefore reverse appellant Brinkley's conviction.

■ We think it appropriate to suggest at this point how this type of situation might be handled. When an extrajudicial statement of one defendant, which implicates his codefendant is sought to be introduced, the trial judge should delete from the statement all references to the nondeclarant codefendant.[9] If this is not feasible then a severance under Super.Ct.Cr.R. 14 should be granted on motion, or with the consent, of the nondeclarant defendant.[10]

In reversing one of these convictions, we imply no criticism of the trial judge; he recognized at once the seriousness of the problem and questioned the wisdom of the prosecutor in offering the testimony. We realize the difficulty of the question and note from the record the thoughtful consideration the trial judge gave to his decision.

The Circuit Court here once observed that "the course to be taken at a trial is not always clear. On appeal, where there is opportunity for deliberation and reflection, the correct course is sometimes more readily apparent than when a prompt ruling is required during a trial. . . ." Kramer v. United States, 115 U.S.App.D.C. 50, 53, 317 F.2d 114, 117 (1963).

Appellant Smith's conviction for armed robbery is affirmed; his conviction on the assault with a dangerous weapon count is

vacated since it is merged in the other charge.

Appellant Brinkley's convictions are reversed and the cause remanded for further proceedings not inconsistent with this opinion.

So ordered.

witness placed petitioner at the scene of the crime with a gun. In *Schneble, supra* at 430–431 of 405 U.S., 92 S.Ct. 1056, petitioner made a detailed confession admitting that he strangled the murder victim, but claiming that somone else shot her as she lay dying.

9. *See* Posey v. United States, 416 F.2d 545, 550–551 (5th Cir. 1969), cert. denied, 397 U.S. 946, 90 S.Ct. 964, 25 L.Ed.2d 127 (1970).

10. *See* Sims v. United States, 132 U.S.App. D.C. 111, 113, 405 F.2d 1381, 1382 (1968).