**Woodrow N. WILSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 94–CF–628.**

District of Columbia Court of Appeals.

Argued Oct. 17, 1995.
Decided Jan. 30, 1997.

James P. Young, Washington, DC, with whom Jeffrey T. Green was on the brief, for appellant.

Judson Lobdell, Assistant United States Attorney, Washington, DC, with whom Eric H. Holder, United States Attorney, and John R. Fisher, Thomas J. Tourish, Jr., and Ronald Walutes, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and RUIZ, Associate Judges.

Opinion for the court PER CURIAM.

Concurring opinion by Associate Judge RUIZ at 470.

PER CURIAM:

On this appeal from his conviction for first degree (premeditated) murder, Wilson contends primarily that the trial court erred in admitting evidence of threats he had made to kill the victim, without affording him the protections of *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), pertaining to "other crimes" evidence. As we conclude that the threats were direct evidence of the crime charged and not subject to analysis under *Drew,* we reject appellant's argument,[1] and affirm.

## I.

The government's evidence showed that Wilson took a car he often drove to be repaired by a local mechanic. The repairs took place in an alley. While Wilson was away, someone threw a jack handle through a window of the car. When Wilson returned, he was told that the decedent, Powell, to whom Wilson owed a small debt, had done it. One witness testified that Wilson said that he would "bust" Powell; another testified that Wilson said, "I'm going to kill" Powell, repeating the threat "four or five times."

Wilson made the threats on Wednesday evening. Powell was killed the following Fri-

---

1. We further reject appellant's claim of prejudice with respect to the belated disclosure of certain exculpatory evidence. See part III, *infra.*

day night. A man dressed in clothes similar to those worn by Wilson around that time was seen to flee from the scene of the killing in a car similar to one owned by a friend of Wilson's. As he lay dying, police asked Powell who shot him. He responded, "June," and gave a brief description of his attacker's attire and the weapon he used. Wilson's nickname is "June." Conducting a search of the scene, police found among the debris on the sidewalk a paper bag with Wilson's fingerprint on it. Wilson testified on his own behalf and presented an alibi defense, which the government largely impeached.

At trial, Wilson objected that the threat evidence was inadmissible "other crimes" evidence. The government countered that the evidence should not be analyzed under *Drew* but under *Toliver v. United States,* 468 A.2d 958 (D.C.1983). The trial court did not determine whether the proffered evidence of Wilson's threat against Powell was admissible under *Drew* or *Toliver.* Assuming it was *Drew* evidence, however, the trial court ruled that the government had made the required proffer that the evidence was relevant to show motive, intent and premeditation and that *Drew's* requirements were satisfied.

Testimony adduced at trial revealed that during the grand jury proceedings, the government had learned that Powell knew two other persons nicknamed "June" (or "June Bug"). The prosecution asserted that it had not disclosed that fact because its own investigation had shown that the two other "Junes" had good alibis. Indeed, both individuals had testified before the grand jury. The trial court ordered the grand jury testimony of these persons to be produced to the defense, and found that the government should have disclosed earlier its information concerning the existence of the two Junes. Consequently, the court granted defense counsel a five-day continuance to investigate the matter. It also permitted the defense to recall any witness and to interview witnesses in the courtroom. The defense then called

and examined both witnesses nicknamed "June" as to their alibis.

## II.

Wilson contends that the evidence of his threat to kill Powell should not have been admitted without the protections which *Drew v. United States, supra,* requires in the case of "other crimes" evidence. Specifically, he contends that the government should have been required to disclose the evidence of the threats in advance of trial,[2] the court should have held an *in limine* hearing to determine whether the fact of the threats had been shown by clear and convincing evidence, and the court should have instructed the jury at trial concerning the limited use of such evidence of other crimes.

We conclude, to the contrary, that the threats were not evidence of the kind governed by *Drew* and to which the special protections for "other crimes" evidence apply. Wilson's threats to kill Powell, made less than three days before the slaying, were direct evidence of the crime charged within the meaning of our decisions, chiefly our recent decision for the entire court in *Johnson v. United States,* 683 A.2d 1087 (D.C. 1996) (en banc).

"[I]t has never been doubted that the threats of an accused person are admissible to show his doing of the deed threatened." 6 WIGMORE, EVIDENCE § 1732, at 157 (Chadbourn rev. 1976). Evidence of a relatively contemporaneous threat to do the charged act is perhaps the prototypical instance of evidence not "subject to *Drew* strictures" because it "is *not* independent of the crime charged" and so is "admissible as direct proof of guilt." *Johnson,* 683 A.2d at 1096. As we pointed out in *Johnson,* evidence of a defendant's threat to a *witness* in the case has not been treated as other crimes evidence but rather as "an admission, directly relevant to guilt." *Id.* at 1097 (quoting *Smith v. United States,* 312 A.2d 781, 785 (D.C.1973)). A threat made to the victim to

---

2. *But see Lewis v. United States,* 567 A.2d 1326, 1329 (D.C.1989) (footnote omitted) ("[T]here exists no specific rule [in this jurisdiction] mandat-

ing that the government provide advance notice of its intention to introduce *Drew* evidence").

do the very act charged should be treated no differently.[3]

Of course, "whenever"—and not simply in the *Drew* context—"relevant evidence poses a danger of unfair prejudice," the trial court "must weigh the apparent probative value of the evidence against the unfairly prejudicial effect that it is likely to have." *Id.* at 1098. But the risk of *unfair* prejudice to Wilson from the threats was minimal, while the probative value of the evidence was exceptionally high, *see* WIGMORE, *supra,* as the trial court implicitly found. Beyond that, Wilson was not entitled to have the threats evidence singled out for any special protection or instruction of the sort our other crimes law imposes.[4]

Finally, although the threats were not *Drew* evidence, nothing in our decision prevents individual trial judges from including such conduct within the scope of "other acts" evidence which they require to be disclosed beforehand in order to minimize the possibility of surprise. *See Johnson,* 683 A.2d at 1100 n. 17.

### III.

■ Wilson contends that had he known earlier of the potentially exculpatory evidence produced at trial concerning the existence of other acquaintances of the decedent nicknamed "June," he would have refrained from testifying (and thereby would have avoided being impeached) and would not have called a police officer as a witness to testify about the number of "Junes" in the city. The government argues that the evidence was disclosed in sufficient time to be used by the defense effectively at trial, particularly in light of the production of the relevant grand jury transcripts, the trial court's grant of a five-day continuance, its permitting Wilson to recall witnesses, and its offer to allow Wilson to interview witnesses in the courtroom.

We review for abuse of discretion. *Edelen v. United States,* 627 A.2d 968, 972 (D.C. 1993). In view of the ample opportunity the trial court afforded to the defense to investigate and to present additional evidence, and the consistency of the newly-disclosed evidence with the theory of the defense, it cannot be said that the trial court abused its discretion.

*Affirmed.*

RUIZ, Associate Judge, concurring:

I agree with the majority's conclusion that the evidence of a threat to kill Powell made by Wilson was admissible without any special safeguards. As in *Johnson v. United States,* 683 A.2d 1087, 1109–10 (D.C.1996) (en banc) (Ruiz, J., concurring), I prefer to reach that result, not by applying a formula as to whether the evidence of uncharged conduct is "*Drew*" or "non-*Drew,*" but by considering the reasons why we apply special prophylactic rules when evidence of uncharged conduct is proffered. Under our jurisprudence, evidence that is considered to be "*Drew*" evidence, as a category, may be admissible to show something other than propensity to commit crime, but only subject to certain prophylactic measures, such as a judicial finding by clear and convincing evidence that the defendant committed the uncharged conduct and an instruction to the jury as to proper use of the evidence.[1] However, the admission even of evidence of uncharged conduct that does not fall under *Drew* may, in

---

**3.** At the same time, we reject the government's effort to squeeze the threats evidence here into the narrow category of *"Toliver"* evidence, for which we have required much closer temporal and spatial proximity than shown here. *See, e.g., Parker v. United States,* 586 A.2d 720, 724 (D.C. 1991).

**4.** In an individual case concerning even *"non-Drew* evidence," the trial court may be required to "exercise sound discretion in passing upon a request for a cautionary instruction that would limit the jury's consideration of that evidence to its proper purpose." *Johnson,* 683 A.2d at 1097 n. 10. But appellant made no such request here,

and it is difficult to imagine the form such an instruction might have taken: the evidence was admissible precisely as proof that because Wilson threatened to kill Powell, he did so in fact—or at least that, having threatened the murder, it was more probable that he did the slaying than if he had made no such threat.

**1.** *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), is the case most often cited as epitomizing the rule; indeed, the name of the appellant in that case has become synonymous with the rule.

certain circumstances be conditioned on compliance with particular safeguards—as the *per curiam* opinion for the court recognizes. See note 4, *ante.* In this case, therefore, I reach the same conclusion as the *per curiam* opinion, but by a somewhat different route.

Although the rule has been cast in many forms, fundamentally, the law in the District of Columbia is that evidence tending to prove the defendant's propensity to commit crime is not admissible for that purpose, but may be admitted if the government shows that the importance of the evidence to proving a material fact in issue outweighs its potential for unfair prejudice[2] *Johnson, supra,* 683 A.2d at 1092–93. The reasons for the rule against propensity evidence are manifold, but are all centered on its acknowledged prejudicial effect. *See Old Chief v. United States,* — U.S. ——, ——, 117 S.Ct. 644, 650–52, 136 L.Ed.2d 574 (1997). There is a concern that the jury will condemn the defendant because of his prior criminal behavior and not because of his guilt of the charged misconduct. *Thompson v. United States,* 546 A.2d 414, 419 (D.C.1988); *Harper v. United*

---

**2.** Even long before *Drew,* courts in this jurisdiction had recognized that evidence showing only propensity is inadmissible. *See, e.g., Harper v. United States,* 99 U.S.App.D.C. 324, 325, 239 F.2d 945, 946 (1956); *Fairbanks v. United States,* 96 U.S.App.D.C. 345, 347, 226 F.2d 251, 253 (1955); *Boyer v. United States,* 76 U.S.App.D.C. 397, 397–98, 132 F.2d 12, 12–13 (1942); *Martin v. United States,* 75 U.S.App.D.C. 399, 399–400, 127 F.2d 865, 865–66 (1942); *Copeland v. United States,* 55 App.D.C. 106, 108, 2 F.2d 637, 639 (1924); *McHenry v. United States,* 51 App.D.C. 119, 123–24, 276 F. 761, 765–66 (1921); *Burge v. United States,* 26 App.D.C. 524, 534–35 (1906); *Ryan v. United States,* 26 App.D.C. 74, 83 (1905); *Funk v. United States,* 16 App.D.C. 478, 492–93 (1900); *see also Kidwell v. United States,* 38 App. D.C. 566, 570 (1912) (remanding for new trial where indictment had joined "separate and distinct felonies" that were "of such a nature that the jury might regard one a corroborative of the other, when, in fact, no corroboration exists"); *Fearson v. United States,* 10 App.D.C. 536, 538 (1897) (rejecting argument that evidence was inadmissible as tending to show defendant's bad character, on ground that its purpose was to show motive).

*Drew* is sometimes said to have established an "exclusionary rule" that limits evidence of other crimes to that which tends to show one of five facts material to the charged offense: motive, intent, identity, the absence of a mistake or accident, and a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to prove the other. *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. Yet before *Drew,* the rule had been stated both as a general rule with exceptions and as a rule that could be stated in "its basic elements." *Compare, e.g., Fairbanks, supra,* 96 U.S.App.D.C. at 347, 226 F.2d at 253 ("The general rule is that upon the trial of an accused person the prosecution may not introduce evidence of another offense wholly independent of the one charged. However, there are many well established exceptions to this rule, so numerous that it has been said that it is difficult to determine which is the more extensive, the doctrine or the acknowledged exceptions.") *and Ryan, supra,* 26 App.D.C. at 83 ("The general rule is.... To this rule there are many well-established exceptions raised by the special circumstances of particular cases.") *with Harper, supra,* 99 U.S.App.D.C. at 325, 239 F.2d at 946 ("Such a statement of the law—in terms of a general rule and specific exceptions—is convenient." Sometimes, however it is helpful to analyze the law into its basic elements. Thus analyzed, the rule is that evidence of other offenses is admissible when substantially relevant to the offense charged; inadmissable when its relevance is insignificant; and, in borderline cases, admissible when its relevance outweighs the undue prejudice that may flow from it, but otherwise inadmissible.) *and Funk, supra,* 16 App.D.C. at 493 ("Had this been the purpose [i.e., to show the defendant's bad character], the admission of the evidence would have been error.... If the evidence was admissible for the purpose claimed by the Government, [i.e., to show flight,] it can not matter that incidentally it may have injuriously affected the character of the defendant with the jury."). Even after *Drew,* the United States Court of Appeals for the District of Columbia noted that the question of whether the rule in this jurisdiction was conclusionary or exclusionary was open. *Bradley v. United States,* 140 U.S.App.D.C. 7, 12 n. 18, 433 F.2d 1113, 1118 n. 18 (1969).

More recently, however, this court has said that the rule in this jurisdiction is exclusionary. *Thompson v. United States,* 546 A.2d 414, 419 (D.C.1988). We have taken pains, however, to emphasize that by "exclusionary" we mean not that the evidence must fit within one or more of the categories in *Drew*—"[t]hat enumeration ... is illustrative rather than exclusive"—but instead that the evidence is "presumptively inadmissible and the prosecutor has the burden of showing that the evidence falls within one or more of the recognized exceptions." *Holmes v. United States,* 580 A.2d 1259, 1267 (D.C.1990). Thus, in the District of Columbia, " 'courts must view with a jaundiced eye evidence purportedly offered as relevant to some other issue but in reality bearing wholly or primarily on the defendant's predisposition to commit another similar crime.' " *Id.* (quoting *Thompson, supra,* 546 A.2d at 420).

*States,* 99 U.S.App.D.C. 324, 325, 239 F.2d 945, 946 (1956). Disputes concerning the uncharged conduct multiply the issues in the case, leading to delay and jury confusion. *Boyer v. United States,* 76 U.S.App.D.C. 397, 398, 132 F.2d 12, 13 (1942). And, perhaps most important, indiscriminate admission of a defendant's prior, uncharged misconduct "would be to put a man's whole life in issue on the charge of a single wrongful act, and crush him by irrelevant matter which he could not be prepared to meet." *Burge v. United States,* 26 App.D.C. 524, 535 (1906) (internal quotation omitted).

Because of the potential for unfair prejudice stemming from the admission of evidence of prior criminal acts, several prophylactic rules have been developed. First, it has long been the rule that the trial court should instruct the jury about the proper use of such evidence. *Sweet v. United States,* 449 A.2d 315, 319 (D.C.1982) (citations omitted); *see Funk v. United States,* 16 App.D.C. 478, 493 (1900) ("The defendant could have asked a special direction or instruction to the jury limiting its consideration to the purpose of admission strictly."). Such an instruction may combat the tendency of the jury to misuse the uncharged misconduct by inferring a propensity to commit crime, and from that, inferring guilt of the charged offense, or simply lowering the standard of proof in light of the defendant's presumptive bad character.

Second, evidence showing the defendant guilty of uncharged crimes should not be admitted until the government has shown to the trial court's satisfaction, out of the presence of the jury, that it has clear and convincing evidence of the defendant's culpability and that the probative value of the evidence outweighs its potential for undue prejudice. *Groves v. United States,* 564 A.2d 372, 375 (D.C.1989); *United States v. Bailey,* 164 U.S.App.D.C. 310, 313, 505 F.2d 417, 420 (1974); *see U.S. v. Bussey,* 139 U.S.App.D.C. 268, 273, 432 F.2d 1330, 1335

(1970) (dictum); *see also Daniels v. United States,* 613 A.2d 342, 346 (D.C.1992) (questioning lineage of hearing requirement in general and clear and convincing standard in particular, but recognizing that it had become entrenched in our case-law).[3] The reason for the hearing requirement to determine whether there is clear and convincing evidence that the defendant committed the uncharged misconduct is "the inherent prejudice of other crimes evidence." *Groves, supra,* 564 A.2d at 375. It serves three purposes: shielding the jury from potentially inadmissible prejudicial evidence; providing the court an opportunity to balance the prejudice against the probative value; and permitting the trial court to consider the timing of the admission of the evidence. *Bailey, supra,* 164 U.S.App.D.C. at 313, 505 F.2d at 420.

Finally, we have held that the trial court should control the timing of the admission of evidence of uncharged misconduct. *Thompson, supra,* 546 A.2d at 423–24; *see also Bailey, supra,* 164 U.S.App.D.C. at 313, 505 F.2d at 420 (holding that government should generally be precluded from mentioning other crimes evidence during its opening statement). In particular, the trial court should generally defer its decision concerning the admission of uncharged misconduct evidence where it is offered to prove intent until after the defense case. *Thompson, supra,* 546 A.2d at 424. By so deferring its decision, the trial court will be in a better position to weigh the need for the evidence against the substantial possibility of prejudicial effect. *Id.*

In the present case, Wilson urges that we adopt a fourth procedural protection: a requirement that the government disclose to the defense in advance of trial its intention to introduce evidence of other crimes. We have expressly reserved the question whether we should require advance notice.[4] *Johnson, supra,* 683 A.2d at 1116 n. 17; *Ford v. Unit-*

---

3. In *Johnson, supra,* 683 A.2d at 1099, the court adopted the balancing test in Federal Rule of Evidence 403 that "probative value is substantially outweighed by the danger of unfair prejudice."

4. I note, however, that trial court judges have discretion to adopt the practice in their courtrooms and that it may be advantageous to the government, as well as to the defendant, to do so. *See Johnson, supra,* 683 A.2d at 1116 n. 17; *id.* at 1107–08 (King, J., concurring).

*ed States,* 647 A.2d 1181, 1184 (D.C.1994); *see also Lewis v. United States,* 567 A.2d 1326, 1329 (D.C.1989) (noting that this jurisdiction does not have such rule).

The government urges that the evidence concerning Wilson's threat to Powell's life was not "other crimes" evidence. Hence, it asserts that none of the prophylactic measures are appropriate. It relies for that proposition on our decisions in *Smith v. United States,* 312 A.2d 781 (D.C.1973), and *Toliver v. United States,* 468 A.2d 958 (D.C. 1983). In *Smith,* the government presented evidence that the defendant had, in the course of threatening a witness to the charged offense, admitted his guilt. 312 A.2d at 784. We held,

> The case before us does not fall within the above doctrine regarding the inadmissibility of evidence of other crimes since the evidence was not admitted for the purpose of proving "disposition to commit crime"; it was, rather, admitted directly to prove guilt, inasmuch as it contained an admission of complicity in the crime.
>
> What we have before us is a situation where an admission, directly relevant to guilt, is entwined with other evidence, a threat, such other evidence tending to prove another, but unrelated criminal act, obstruction of justice. Smith contends that the otherwise admissible evidence of the admission is rendered inadmissible by the presence of the threat evidence. We disagree.

*Id.* at 785.

We continued the analysis by holding that the trial court did not abuse its discretion in finding that the probative value of the evidence outweighed its potential for unfair prejudice. *Id.* at 785 & n. 5. We were not presented with any question regarding whether any of the prophylactic measures at issue in the present case were improperly denied.[5] Moreover, the phrase "admitted directly to prove guilt" worked no innovation

upon the law in this jurisdiction; a similar phrase had been used nearly three-quarters of a century earlier. *Burge, supra,* 26 App. D.C. at 535 ("Whatever tends directly to prove a defendant guilty of the crime charged, though guilty also of another, may be shown against him; but his cause cannot be prejudiced by the evidence disclosing irrelevant guilt.") As used in these cases, the term, "directly," is used to distinguish evidence that shows guilt only through the impermissible propensity inference, and that which shows guilt through another, permissible route. Thus, *Smith* stands merely for the commonplace proposition that evidence that is relevant to prove guilt by means of an inference not involving propensity will not be excluded merely because it may also support the conclusion that the defendant has a disposition to commit crime. See *Johnson, supra,* 683 A.2d at 1098. *Smith* does not address whether the prophylactic measures requested in this case are nevertheless appropriate to guard against an impermissible inference of propensity.

In *Toliver,* the defendant was charged with possession of heroin. 468 A.2d at 959. During its case-in-chief, the government introduced evidence of the circumstances surrounding the defendant's arrest, which included evidence that the defendant had been selling heroin. *Id.* On appeal, the defendant contended that the trial court should have instructed the jury that the evidence could be used only "to explain the surrounding circumstances of the possession offense." *Id.* at 960. We held that no instruction was required, reasoning that "this limited class of evidence is not other crimes evidence because it is too intimately entangled with the charged criminal conduct." *Id.* "[T]he sales evidence arose from the same series of transactions which underlay the charged possession offense.... [Thus,] in cases where evidence of incidental, uncharged criminal conduct is inextricably intertwined with evidence of the charged offense, evidence of the

5. The appellant in *Smith* did contend that the trial court should have sua sponte given a limiting instruction to the effect that the evidence could only be used to show "consciousness of a weak case." *Id.* at 785. We noted that the appellant had not requested such an instruction and, in any event, that the evidence constituted an implied admission of guilt. *Id.* There does not appear to have been any contention that the court should have cautioned the jury regarding any inference based on propensity.

uncharged criminal conduct is directly admissible without the necessity of a cautionary ... instruction." *Id.* at 961.

*Toliver,* also, was not an innovation in the law of evidence in this jurisdiction. Courts in this jurisdiction had long held that evidence of other crimes so connected with the charged offense that the government's case could not be presented without it was admissible, notwithstanding the rule against propensity evidence. *Green v. United States,* 440 A.2d 1005, 1007 (D.C.1982); *Tabron v. United States,* 410 A.2d 209, 214 (D.C.1979); *Day v. United States,* 360 A.2d 483, 485 (D.C.1976); *Copeland v. United States,* 55 App.D.C. 106, 108, 2 F.2d 637, 639 (1924). In subsequent cases, we have construed *Toliver* as limited to those " 'events so closely related to the charged offense in time and place that they are necessary to complete the story of the crime.' " *Holmes v. United States,* 580 A.2d 1259, 1266 (D.C.1990) (quoting *Williams v. United States,* 549 A.2d 328, 333 (D.C. 1988)). We have explained that *Toliver* and its kin "support the uncritical admission of bad acts and other crimes evidence that is so intertwined with the charged conduct that the latter is unclear without the former, but only where there is a close temporal relationship." *Parker v. United States,* 586 A.2d 720, 724 (D.C.1991).

What is implicit in the *Toliver* class of cases, and the rule that I explicitly apply today, is that where the evidence of uncharged misconduct is closely connected—both temporally and transactionally—with the charged conduct, there is no substantial risk that the jury would misuse the evidence by concluding that the defendant had a propensity to commit crime and was therefore guilty of the charged offense. Thus, limiting instructions are not required because the potential prejudice in such cases is minimal. Indeed, they may even be against the defendant's interest. *Cf. Tabron, supra,* 410 A.2d at 214 n. 6 (noting that at trial, defendant "insisted that he did not want to highlight the evidence by giving limiting instructions"). Moreover, by requiring a close connection between the charged and uncharged misconduct, concerns regarding unfair surprise and

multiplicity of issues are greatly diminished, if not eliminated.

The rule announced in *Toliver* must be understood in light of its underlying purpose—to excuse the government and the court, where appropriate or necessary, from complying with one or more of the prophylactic measures surrounding uncharged misconduct evidence. By the same token, those protections should be employed where their policies are implicated or would be served by their enforcement or where their implementation would not unduly prejudice the government's case. It is in light of that approach that I address Wilson's claims in this case.

Wilson urges this court to adopt an advance notice requirement. Advance notice could be appropriate where the government proposes to introduce certain types of misconduct evidence. One of the concerns underlying the rule against proof of propensity is that it tends to place the entire life of the defendant on trial. In addition, the evidence has a strong and often unfair—to the defendant—impact on the trier of fact. Unless a defendant is able to effectively meet the government's evidence of the misconduct, the defendant is forced either to put his character in issue, or, more often, to concede the issue of character and propensity and hope that the jury will be able to follow the trial court's instruction regarding the limited use to which the evidence should be put.

Therefore, advance notice would be appropriate where the misconduct would have a strong tendency to show propensity on the part of the defendant to commit the crime charged. As we observed in *Ford v. United States,* 647 A.2d 1181 (D.C.1994):

> [A]sserted prejudice to the ability to prepare (through lack of notice) should bear some relation to the particular prejudice *Drew* evidence carries with it, *viz.,* the risk of conviction by proof of "propensity"; but that risk is diminished when the acts [of misconduct] are ... conceptually different. ...

*Id.* at 1185 (footnote omitted).

If the prejudice is not related to concerns about proof by propensity, then we are left

only with general concerns regarding the limited pretrial disclosures required of the government. *See id.* at 1185 n. 9. Thus far, those concerns have been resolved against the defendant in criminal cases.

In light of the foregoing, no advance notice was required in the present case by the principles underlying the rule against propensity evidence and the policies counselling restriction of evidence that tends to show propensity.[6] In this case, the uncharged misconduct was a threat to commit the murder, which occurred two and one half days later, with which the defendant was charged. It is highly unlikely that any juror would infer from that single threat that Wilson had a general propensity to commit criminal acts, and from that inferred propensity, that Wilson committed the murder charged. It is also unlikely that a juror would infer that if Wilson is the type of person who could threaten to kill Powell, Wilson also is the type of person who would actually kill Powell. Jurors understand that although a person may voice a threat, he may never follow through. It is far more likely that a juror would conclude, in conjunction with the other evidence pointing to Wilson's guilt, that he wanted to kill Powell and acted on that desire. That is strong evidence of motive and identity, not an impermissible propensity inference. No special protection by way of advance disclosure was needed to protect him from being subjected to proof by propensity. Nor can Wilson claim that he was unfairly surprised by having to answer evidence concerning his recent threat relating to the person of whose murder he was charged.[7]

The other protective measures Wilson asserts were improperly denied him are similarly inapplicable to the facts of this case.

The restriction on mentioning misconduct evidence during the prosecution's opening statement is imposed because, in light of developments at trial, such proof may turn out to be unnecessary and unduly prejudicial. If that is the case, then the prosecution's opening statement could never be retracted and would stick in the mind of the jury. In the instant case, however, there was no question that evidence of the threat would be admissible. No conceivable defense could obviate the government's need for the evidence. Moreover, the threat was a cornerstone of the government's case, particularly as to premeditation; hence, it would be unduly prejudicial to require the government to withhold that evidence. In this context, the prosecutor's mention of the threat evidence during opening argument was not improper.

Wilson contends that the trial court erred when it resolved his objection to the threat evidence by considering only the prosecutor's proffer. Defense counsel did not, however, request an evidentiary hearing or object to the mode by which the prosecution showed, and the trial court found, clear and convincing evidence that Wilson uttered the threat; therefore, we review the trial court's decision for plain error. *See Lewis v. United States,* 567 A.2d 1326, 1330–31 (D.C.1989) (reviewing for plain error where defendant did not request express finding of clear and convincing evidence). Moreover, we have held that the method of demonstrating clear and convincing proof is left to the discretion of the trial court. *Daniels, supra,* 613 A.2d at 347. In any event, based on the prior analysis, in this case there was no need to show clear and convincing proof of the threat because the evidence of the threat was not susceptible to use as propensity evidence. Indeed, because the threat was so closely related to the mur-

---

6. In contrast, where uncharged misconduct is presumptively inadmissible because of the risk of conviction by propensity evidence, advance notice is an appropriate safeguard against the risks of surprise and prejudice.

7. Government counsel stated during the pretrial hearing that "I don't think we will have *Drew* [evidence] in this case." Even though that statement may accurately reflect the government's view that the threat evidence was admissible under *Toliver,* the government must have known that the defendant would challenge the applica-

bility of *Toliver* and argue that the evidence was inadmissible under *Drew.* In the context of the court's rule requiring disclosure of *Drew* evidence so that the issue of admissibility can be resolved pretrial, the government's statement is uncomfortably close to disingenuous. I note, however, that the trial court granted a continuance of a day and a half after the government's opening statement mentioning the threat evidence for the first time, before defense counsel presented her opening statement.

der, it is likely that the jury considered the threat evidence under the more exacting standard of guilt beyond a reasonable doubt applicable to the crime charge. In light of those factors, there was no error in the trial court's approach.

We similarly review for plain error the trial court's failure to instruct the jury about the proper use of the evidence of the threat. The instruction was not required in this case because, for the reasons already stated, the threat evidence was not likely to lead the jury to convict Wilson of murdering Powell by propensity evidence.

Under the circumstances of this case, the threat evidence posed none of the dangers that counsel for exclusion of evidence of uncharged misconduct. Consequently, there was no error in denying Wilson the benefit of the prophylactic measures developed to mitigate those dangers.